PRYOR, Circuit Judge:
This petition for review, filed by an Iranian who has converted from Islam to Christianity and claims to fear persecution in Iran where apostasy is punishable by death, places this Court between Scylla and Charybdis. A denial of review will return the petitioner to the theocratic regime in Iran, but an erroneous grant of review could establish a precedent that rewards less than genuine fears of persecution based on religious conversion. Hani Kazemzadeh, a native and citizen of Iran, petitions this Court for review of the denial of his application for asylum and withholding of removal based on political and religious persecution. The main issue presented is whether the Immigration Judge and the Board of Immigration Appeals gave reasoned consideration to Kazemzadeh’s evidence that he has a well-founded fear of persecution based on his conversion to Christianity while in the United States.
The right course between the threats of Scylla and Charybdis is for the Board to reconsider the record, which contains important evidence that the Board failed to mention. Although substantial evidence supports the decision of the Board that Kazemzadeh failed to prove a well-founded fear of persecution based on his political opinion, the Board failed to give reasoned consideration to Kazemzadeh’s evidence of a well-founded fear of persecution based on his religion. There is evidence that the law against apostasy is not often enforced in Iran, but neither the Board nor the Immigration Judge considered Kazemzadeh’s testimony that Iranians who convert from Islam to Christianity avoid punishment by instead suffering persecution by practicing underground. The Board and the Immigration Judge also failed to consider whether the Iranian regime has a heightened interest in Kazemzadeh that makes it more likely that Kazemzadeh’s conversion will be discovered. We deny Kazemzadeh’s petition about political persecution, and we grant Kazemzadeh’s petition about religious persecution, vacate the decision of the Board about that claim, and remand for further proceedings consistent with this opinion.
I. BACKGROUND
Our discussion of the background of this petition is divided in three parts. We first discuss Kazemzadeh’s entrance to the United States and his application for asylum and withholding of removal. We next discuss Kazemzadeh’s removal hearing and the decision of the Immigration Judge. We then discuss Kazemzadeh’s appeal to the Board and its decision.

A. Kazemzadeh’s Entrance to the United States and Application for Asylum and Withholding of Removal

Kazemzadeh entered the United States on April 7, 2005, as a nonimmigrant visitor entitled to remain in the country until October 6, 2005. Kazemzadeh stayed in the United States longer than permitted. On March 20, 2006, Kazemzadeh applied *1346 for asylum, 8 U.S.C. § 1158(a)(1), and withholding of removal, id. § 1231(b)(3), based on religion, political opinion, and membership in a particular social group, and he sought relief under the Convention Against Torture, 8 C.F.R. § 208.16(c)(2).
In his application, Kazemzadeh stated that, while attending a university in Iran in August 2003, he “became involved in the student group opposed to the government of Iran.” He said that he “helped organize and participated in several student demonstrations during this time” and “spoke openly about freedom of religion.” Kazemzadeh stated that he was arrested and detained for several days after he participated in a large demonstration on July 10, 2004. Kazemzadeh alleged that he was interrogated, beaten, tortured, and denied access to his family and an attorney. Kazemzadeh stated that after his release he was monitored by Iranian authorities and the discipline committee of the university. Kazemzadeh alleged that in October 2004 he was summoned to appear before the committee, did not appear because he feared arrest, and stopped attending the university. Kazemzadeh alleged that he was notified in December 2004 that he had been expelled from the university.
Kazemzadeh also stated that in January 2005 he traveled to Germany to apply for a United States visa. Kazemzadeh stated that he returned to Iran later that month and “kept a low profile,” “sometimes sleeping] at friends’ and other relatives’ homes.” Kazemzadeh alleged that in April 2005 he received “a Subpeona [sic] to appear in Court on June 1, 2005.” According to Kazemzadeh, he then decided “to leave Iran for a while to see if things would get better.”
Kazemzadeh alleged that, after he left Iran for the second time, he “was convicted of being an Agitator against the Islamic Republic of Iran and sentenced to 6 years in prison.” Kazemzadeh also stated in his application that in 1987 his father “was accused of being active with an anti-revolutionary group advocating against the government and against the islamic religion.” His father “was found guilty and was expelled from the public education system and from all government jobs for life.”
Kazemzadeh submitted several documents with his application: (1) an undated letter from Jose David Lopez, associate pastor at West Kendall Baptist Church in Miami, Florida, which confirmed Kazemzadeh’s conversion to Christianity while in the United States; (2) a letter dated January 23, 2006, from Rob Myers, senior pastor at West Kendall, which confirmed that Kazemzadeh began visiting West Kendall in September 2005, was baptized on November 6, 2005, and remained a “member in good standing” after his baptism; (3) a certificate of Kazemzadeh’s baptism at West Kendall on November 6, 2005; (4) two letters that summoned Kazemzadeh to appear before the discipline committee of the Iranian university, dated October 24, 2004, and November 24, 2004, respectively; (5) a letter dated December 29, 2004, from the discipline committee to Kazemzadeh, which stated that he had been expelled from the university; (6) a complaint dated January 7, 2005, filed against Kazemzadeh by the committee; (7) a letter dated April 4, 2005, from the Ministry of Justice of Iran that commanded Kazemzadeh to appear in court on June 1, 2005; (8) a default judgment dated August 14, 2005, which sentenced Kazemzadeh to six years in prison; (9) a petition signed by several “residentes] of Bagh Flahat, Restaurant Mizban Street,” which confirmed Kazemzadeh’s arrest on July 10, 2004, and the harassment by the authorities that followed; and (10) various forms of government-issued identification.
After an asylum officer interviewed Kazemzadeh and declined to grant him asy *1347 lum, the Immigration and Naturalization Service charged him with removability, 8 U.S.C. § 1227(a)(1)(B), and ordered him to appear at a removal hearing. Kazemzadeh appeared with counsel. Kazemzadeh admitted the allegations in the notice to appear, conceded removability, and renewed his requests for asylum, withholding of removal, and relief under the Convention Against Torture.

B. Kazemzadeh’s Removal Hearing and the Decision of the Immigration Judge

On October 12, 2006, Kazemzadeh appeared with counsel at the removal hearing. The Immigration Judge admitted three exhibits at the hearing: (1) the notice to appear; (2) Kazemzadeh’s application for asylum and withholding of removal, with all attached documents; and (3) the 2005 country report for Iran published by the State Department. The government objected to the documents attached to Kazemzadeh’s application on the ground that the documents were not authenticated, and the Immigration Judge noted the objection. The Immigration Judge heard testimony from Kazemzadeh and Pastor Lopez.
Kazemzadeh initially testified about his political activities in Iran. Kazemzadeh testified that one month after he began attending a university in Bushehr, Iran, in 2003, he and two friends organized a weekly discussion group of about 50 students. He later testified that he had organized the group before entering the university. Kazemzadeh stated that the main concern of the group was “freedom, freedom of the expression and freedom of religion and also there was some other fact like poverty and other stuff.” Kazemzadeh testified that he “grew up in a political family because [his] father was from the childhood always was interested in politics!,]” but that he was not active politically before entering the university.
Kazemzadeh testified that he participated in three demonstrations in Iran. The first demonstration was in Tehran in 2003 and was attended by “more then 500 students.” Kazemzadeh testified that the first demonstration was peaceful, but that the “Bashigis Islamic government” would try to stop the demonstrations and the police would use batons, fire hoses, and gas. The second demonstration was in Tehran in spring 2004 and was attended by about 500 to 600 students. The third demonstration was at the university Kazemzadeh attended in Bushehr in July 2004 and was attended by 150 students. That demonstration commemorated the arrest of another student.
Kazemzadeh testified that he and three other students were arrested when the police used batons and gas to stop the third demonstration. The police took Kazemzadeh and the other three students by car to a prison, where they were placed in separate rooms. Kazemzadeh testified that he was then beaten and questioned about his discussion group for five hours. Kazemzadeh testified that the police used their hands and electric wire to beat him and beat him on his knees to hide his bruises. Kazemzadeh testified that he was detained for four days. Kazemzadeh testified that, after his release from prison, the authorities came to his home, questioned him, and monitored his contact with student groups.
Kazemzadeh testified that, when he returned to the university in October 2004, he received a letter that summoned his appearance before the discipline committee. Kazemzadeh testified that he did not appear before the discipline committee because he “was afraid to be arrested again” and instead left the university. Kazemzadeh testified that he received two more letters from the committee after he left the university. The first letter again sum *1348 moned Kazemzadeh to appear before the committee, and the second letter informed Kazemzadeh that he had been expelled from the university for “not following the Islamic tradition!.]”
Kazemzadeh testified that he decided to travel after he received the expulsion letter because he “felt [his] situation [was] getting dangerous in Iran[.]” Kazemzadeh traveled to Germany, where he interviewed at the United States consulate to apply for a visa. The consulate official told Kazemzadeh that it would take 40 days to conduct a background check and issue him a visa. Kazemzadeh returned to Iran after his visa to stay in Germany expired.
Kazemzadeh testified he did not apply for asylum in Germany because he had “two uncle[s] in the United States” where he had better opportunities. Kazemzadeh testified that he stayed with friends, instead of his parents, when he returned to Iran because he “was afraid to get arrested.” The authorities “contacted] [his] home and they questioned [his] parents.” The authorities also sent Kazemzadeh a letter “inviting [him] to the Islamic republic court[,]” but Kazemzadeh failed to appear. Kazemzadeh testified that in April 2005 he was notified that his visa was ready. Two weeks later, and three days after receiving the letter about the court appearance, Kazemzadeh traveled to Germany and then to the United States.
Kazemzadeh testified that after he left Iran he was sentenced in absentia to six years of imprisonment for his participation in antigovernment activities. Kazemzadeh testified that he did not know what happened to the three other students who were arrested at the demonstration. Kazemzadeh testified that he had not been in contact with them because “[f]or their sake it’s not good for me to contact them.” Kazemzadeh testified that he had been in contact with his parents, but that his parents are afraid to use the telephone.
Kazemzadeh testified that he did not intend to apply for asylum upon arriving in the United States. Kazemzadeh testified that he would be arrested and imprisoned, on account of his political activities, if he returned to Iran. When asked by the Immigration Judge why the authorities would arrest him now, despite failing to do so when he returned from Germany, Kazemzadeh explained “[b]ecause all these things happened before the court ordered, sentenced me to jail.”
Kazemzadeh testified that his father had been a high school philosophy teacher, but was no longer allowed to hold a government position because he was involved with an “anti-government group” and “tried to convince the other students to follow his ideal.” Kazemzadeh testified that in 1988 the Iranian government arrested his father, detained him for five days, tried and convicted him in absentia upon his release, discharged him from his teaching position, and barred him from future government employment. Kazemzadeh also testified that his only sibling, a brother who lived in Tehran, was unable to work because of his father’s activities.
Kazemzadeh also testified about his religious conversion. Kazemzadeh testified that he was born a Muslim, but converted to Christianity in November 2005, while in the United States. His friend, Fahr Naghib, introduced Kazemzadeh to the West Kendall Baptist Church, which was only a five-minute walk from his house. Naghib had joined that church after converting to Christianity from Islam. Kazemzadeh testified that the “peaceful aspect of Christianity” attracted him. Kazemzadeh testi *1349 fied that he was baptized on November 5, 2005, and that he had attended Tuesday Bible study classes on ten occasions.
Kazemzadeh testified that he had told his uncle about his conversion and his uncle was unconcerned, but Kazemzadeh had not told his parents. Kazemzadeh testified that his mother might be upset by his conversion, but that “it’s not important for [his] dad.” Kazemzadeh testified that Iranians born in the Christian faith practice their religion openly, but that Iranians who convert from Islam to Christianity “practice underground.” According to Kazemzadeh, he would be executed if he returned to Iran and the authorities learned of his conversion.
Pastor Lopez initially testified that he met Kazemzadeh about “7 to 8 months” before Kazemzadeh’s asylum hearing and knew Kazemzadeh for about one or two months before baptizing him. When told on cross-examination that Kazemzadeh had allegedly been baptized on November 6, 2005, which was 11 months before his hearing, Pastor Lopez testified that he met Kazemzadeh about one year before the hearing. Pastor Lopez testified that, after meeting Kazemzadeh, he was “one of the one’s who shared the gospel with [Kazemzadeh] and ... one of the one’s who initially heard him respond towards Christianity.” Pastor Lopez testified that he was “[i]nitially ... a bit skeptical” about Kazemzadeh’s interest in Christianity “because of his background” and the suddenness of his interest, but he later believed Kazemzadeh’s conversion was sincere.
Wfiien asked how often Kazemzadeh attended services on Sundays and Bible study on Tuesdays, Pastor Lopez testified, “In the last year, since I’ve known, I would say 3 out of 4 Sundays a month he’s there, and in home groups, you know, 3 out of 4 weeks he’s there.” When told that Kazemzadeh testified that he had only attended ten Tuesday Bible study classes, Pastor Lopez explained, “Like I said I just made an assumption [about Kazemzadeh’s attendance] because I’m not his home group leader.” Pastor Lopez testified that Kazemzadeh had helped with community service activities of the church.
The 2005 country report for the “Islamic Republic of Iran” published by the State Department stated that the population of Iran is “approximately 68 million” and “is approximately 99 percent Muslim.” The report stated that the “Baha’i, Christian, Zoroastrian, and Jewish communities constituted less than 1 percent of the population.” The report stated that “[i]n 2001 the [United Nations Special Representative for Iran of the Commission on Human Rights] estimated the Christian community at approximately 300 thousand,” and that “[s]ome unofficial estimates indicated that there were approximately 100 thousand Muslim-born citizens who converted to Christianity.” The report stated that “[a]postasy, specifically conversion from Islam, is punishable by death,” but that “there were no reported instances of the death penalty being applied for apostasy during the year.” The report stated that there was one “unconfirmed report on Christian Web sites that on November 22, unidentified persons killed a man who had converted to Christianity more than 10 years earlier.” The report also stated that, on December 19, a Baha’i apostate, who “was arrested in 1995 and faced a life sentence for apostasy,” “died in prison of unknown causes.” “Two other Baha’is were in prison at year’s end, including [one] who ... was sentenced to three years in prison for activities against the security of the state and spreading falsehoods.”
*1350 The Immigration Judge denied Kazemzadeh’s application and ordered him removed to Iran. The Immigration Judge found that Kazemzadeh’s testimony about his fear of persecution on account of his political opinion “was not sufficiently detailed and was too general in nature to provide a plausible and coherent account of the basis for his fears and cannot suffice to establish his eligibility for asylum.” The Immigration Judge credited the testimony of Kazemzadeh and Pastor Lopez that Kazemzadeh had converted to Christianity, but the Immigration Judge found that Kazemzadeh failed to establish a well-founded fear of persecution on account of his religion. The Immigration Judge found that Kazemzadeh failed to prove “that the extent of his involvement [with Christianity] would create a likelihood that he would be identified as a convert and that he would be punished as such.” The Immigration Judge did not discuss Kazemzadeh’s testimony that Iranians who convert from Islam to Christianity practice underground, and the Immigration Judge did not discuss Kazemzadeh’s earlier encounters with the Iranian regime in reference to the potential discovery of his religious conversion.

C. Kazemzadeh’s Appeal to the Board

The Board dismissed Kazemzadeh’s appeal on the ground that he failed to establish eligibility for asylum or withholding of removal. The Board ruled that Kazemzadeh failed to establish that he was persecuted on account of his political opinion because he “failed to allege that he suffered any specific harm” as a result of his arrest, interrogation, beating, and detention. The Board also ruled that Kazemzadeh failed to establish that he has a well-founded fear of persecution on account of his political opinion because he returned to Iran from Germany without incident before later traveling to the United States and he did not authenticate documents to establish that he was convicted in absentia and sentenced to six years in prison after he left Iran.
The Board agreed with the finding of the Immigration Judge that Kazemzadeh failed to establish that he has a well-founded fear of persecution on account of his religion because he did not prove that anyone in Iran is aware of his conversion to Christianity. The Board stated, “To the extent that [Kazemzadeh] argues on appeal that there is a pattern or practice of persecution in Iran against people who convert to Christianity, we find that [Kazemzadeh] failed to establish that such a pattern or practice exists .... ” The Board did not discuss Kazemzadeh’s testimony that Iranians who convert from Islam to Christianity practice underground, and the Board also did not discuss Kazemzadeh’s personal encounters with the Iranian regime in reference to the potential discovery of his religious conversion.
II. STANDARDS OF REVIEW
“We review the decision of the Board, and we review the decision of the Immigration Judge to the extent that the Board expressly adopted the opinion of the Immigration Judge.” Mohammed v. U.S. Att’y Gen., 547 F.3d 1340, 1344 (11th Cir.2008) (citation omitted). Because the Board agreed with the finding of the Immigration Judge that Kazemzadeh failed to establish a well-founded fear of persecution on account of his religion, we review the decisions of both the Immigration Judge and the Board about that issue. Id.We review de novo the conclusions of law by the Board and Immigration Judge, but we review findings of fact for substantial evidence to support them. Al Najjar v. *1351 Ashcroft, 257 F.3d 1262, 1283-84 (11th Cir.2001).
Our review for substantial evidence is highly deferential. Id. at 1284. “[W]e view the record evidence in the light most favorable to the agency’s decision and draw all reasonable inferences in favor of that decision.” Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir.2004) (en banc). We may not “re-weigh the evidence from scratch.” Mazariegos v. U.S. Att’y Gen., 241 F.3d 1320, 1323 (11th Cir.2001) (internal quotation marks omitted). We “must affirm the [decision of the Board] if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole.” Al Najjar, 257 F.3d at 1284 (internal quotation marks omitted). “To reverse [factual findings by the Board], we must find that the record not only supports reversal, but compels it.” Mendoza v. U.S. Att’y Gen., 327 F.3d 1283, 1287 (11th Cir.2003). “[T]he mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative findings.” Adefemi, 386 F.3d at 1027.
The Board and the Immigration Judge “must consider all evidence introduced by the applicant.” Tan v. U.S. Att’y Gen., 446 F.3d 1369, 1374 (11th Cir.2006) (internal quotation marks omitted); see 8 C.F.R. § 1240.1(c) (“The immigration judge shall receive and consider material and relevant evidence .... ”). “ ‘Where ... the [Immigration Judge] has given reasoned consideration to the petition, and made adequate findings, we will not require that it address specifically each claim the petitioner made or each piece of evidence the petitioner presented.’ ” Tan, 446 F.3d at 1374 (quoting Morales v. I.N.S., 208 F.3d 323, 328 (1st Cir.2000)). “The Immigration Judge must consider the issues raised and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted.” Id. (internal quotation marks omitted).
III. DISCUSSION
The Immigration and Nationality Act gives the Attorney General discretion to grant asylum to any alien determined to be a “refugee” within the meaning of the Act. 8 U.S.C. § 1158(b)(1)(A). “A refugee is defined as one who is unable or unwilling to return to his or her home country ‘because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.’ ” Yang v. U.S. Att’y Gen., 418 F.3d 1198, 1202 (11th Cir.2005) (quoting 8 U.S.C. § 1101(a)(42)(A)). “The burden of proof is on the applicant to establish that the applicant is a refugee.” 8 U.S.C. § 1158(b)(1)(B)(i).
“To establish asylum based on past persecution, the applicant must prove (1) that [ ]he was persecuted, and (2) that the persecution was on account of a protected ground.” Silva v. U.S. Att’y Gen., 448 F.3d 1229, 1236 (11th Cir.2006); see also 8 C.F.R. § 208.13(b). “An applicant who has been found to have established such past persecution shall also be presumed to have a well-founded fear of persecution on the basis of the original claim.” 8 C.F.R. § 208.13(b)(1). That presumption may be rebutted if an asylum officer or immigration judge makes either of two findings: (1) that “[t]here has been a fundamental change in circumstances such that the applicant no longer has a well- *1352 founded fear of persecution”; or (2) “[t]he applicant could avoid future persecution by relocating to another part of the applicant’s country of nationality ... and under all the circumstances, it would be reasonable to expect the applicant to do so.” Id. § 208.13(b)(1)(i)(A) & (B). The government bears the burden of establishing by a preponderance of the evidence either changed circumstances or the ability to avoid persecution by relocating. Id. § 208.13(b)(1)(ii).
An applicant may also establish a well-founded fear of persecution without proving past persecution. Id. § 208.13(b)(2). To do so, an applicant must establish a fear of persecution in his country of nationality on account of a protected ground, a “reasonable possibility” of suffering persecution if the applicant returns to that country, and that he is unable or unwilling to return because of his fear. Id. § 208.13(b)(2)(i). The applicant’s fear of persecution must be “subjectively genuine and objectively reasonable.” Al Najjar, 257 F.3d at 1289. The applicant need not establish a reasonable possibility of persecution if the applicant instead proves that he is a member of, or is identified with, a group that is subjected to a “pattern or practice” of persecution in his country of nationality. 8 C.F.R. § 208.13(b)(2)(iii). “An applicant does not have a well-founded fear of persecution if the applicant could avoid future persecution by relocating to another part of the applicant’s country of nationality ... if under all the circumstances, it would be reasonable to expect the applicant to do so.” Id. § 208.13(b)(2)(ii). The applicant bears the burden of proving that it would not be reasonable for him to relocate, “unless the persecution is by a government or is government-sponsored,” id. § 208.13(b)(3)(i), in which case relocation is presumed to be unreasonable “unless the [government] establishes by a preponderance of the evidence that, under all the circumstances, it would be reasonable for the applicant to relocate.” Id. § 208.13(b)(3)(ii). “Where an applicant is unable to meet the ‘well-founded fear’ standard of asylum, he is generally precluded from qualifying for either asylum or withholding of [removal].” Al Najjar, 257 F.3d at 1292-93 (some internal quotation marks omitted).
Our discussion of the merits of Kazemzadeh’s petition is divided in two parts. We first discuss Kazemzadeh’s argument that he suffered political persecution and has a well-founded fear of political persecution. We then discuss Kazemzadeh’s argument that he has a well-founded fear of religious persecution. Kazemzadeh makes only a passing reference in his brief to his application for relief under the Convention Against Torture, so that issue is abandoned. See Sepulveda v. U.S. Att’y Gen., 401 F.3d 1226, 1228 n. 2 (11th Cir.2005); Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n. 6 (11th Cir.1989).

A. The Record Does Not Compel the Finding that Kazemzadeh Suffered Political Persecution or Has a Well-Founded Fear of Political Persecution.

Kazemzadeh argues that he suffered political persecution in Iran and has a well-founded fear of political persecution upon his return to Iran. We disagree. We address each argument in turn.
Kazemzadeh first argues that his evidence of his arrest, interrogation, beating, detention, and harassment established that he had been persecuted on *1353 account of his political opinion, but this argument fails. Substantial evidence supports the finding of the Board that Kazemzadeh “failed to establish that these incidents, whether considered individually or cumulatively, rise to the level of past persecution.” “ ‘[Persecution’ is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation, and ... mere harassment does not amount to persecution.” Sepulveda, 401 F.3d at 1231 (internal quotation marks omitted). Minor physical abuse and brief detentions do not amount to persecution. In Djonda v. United States Attorney General, 514 F.3d 1168, 1171, 1174 (11th Cir. 2008), for example, we ruled that evidence that an alien had been detained for 36 hours, beaten by police officers, and suffered only scratches and bruises did not compel a finding that the alien had been persecuted. In Zheng v. United States Attorney General, 451 F.3d 1287, 1290-91 (11th Cir.2006), we ruled that evidence that an alien had been detained for five days, forced to watch reeducation videos, stand in the sun for two hours, and sign a pledge to no longer practice his religion also did not compel a finding that the alien had been persecuted.
The record does not compel a finding that Kazemzadeh was persecuted. Kazemzadeh testified that he was arrested while participating in a student demonstration, interrogated and beaten for five hours, and detained for four days, but Kazemzadeh did not prove that he suffered any physical harm. Kazemzadeh also testified that after his release he was monitored by Iranian authorities and summoned to appear before both the discipline committee of the university he attended and the “Islamic republic court[,]” but the record does not compel the finding that these incidents were anything more than harassment.
Kazemzadeh argues that “[a]s soon as he steps foot in Iran, he will be taken into custody and once again subjected to horrible detention conditions including beatings such as he experienced in the past[,]” but the record does not compel that finding. Kazemzadeh’s testimony that he chose not to apply for asylum in Germany, returned to Iran from Germany without incident before later traveling to the United States, and did not intend to apply for asylum when he arrived in the United States supports the finding that Kazemzadeh failed to prove a well-founded fear of persecution on account of his political opinion. See De Santamaria v. U.S. Att’y Gen., 525 F.3d 999, 1011 (11th Cir.2008). Kazemzadeh produced documentary evidence that he had been convicted in absentia and sentenced to six years of imprisonment, but the documents did not state the reason for his conviction. The Board was entitled to discount the evidence because the documents had not been authenticated. Yang, 418 F.3d at 1202 n. 3.

B. The Board Failed To Give Reasoned Consideration to Kazemzadeh’s Claim of a Well-Founded Fear of Religious Persecution.

The closer issue presented by Kazemzadeh’s petition is whether he has a well-founded fear of persecution based on his religious conversion. The Board found that Kazemzadeh’s conversion to Christianity is genuine, and it is undisputed that apostasy is a capital offense in Iran. Kazemzadeh’s petition depends on whether the record compels a finding of a reasonable possibility that he will be persecuted for being a convert.
At oral argument, counsel for the Attorney General contended that the rec *1354 ord allows an inference that Kazemzadeh will not practice Christianity when he returns to Iran, but we disagree. There is no evidence that Kazemzadeh will cease practicing Christianity in Iran. Neither the Board nor the Immigration Judge discredited Kazemzadeh’s testimony or other evidence about his conversion, which means that we will not allow the government to suggest now that Kazemzadeh’s conversion is less than credible. “Where an [Immigration Judge] fails to explicitly find an applicant’s testimony incredible and cogently explain his or her reasons for doing so, we accept the applicant’s testimony as credible.” De Santamaria, 525 F.3d at 1011 n. 10; see also Mejia v. U.S. Att’y Gen., 498 F.3d 1253, 1257 (11th Cir.2007) (“The [Immigration Judge] did not [make an adverse credibility finding] here, and thus we accept Mejia’s testimony as credible.”).
When the Board ruled that Kazemzadeh failed to prove that there is a pattern or practice of persecution in Iran against Muslims who convert to Christianity, the Board was “entitled to rely heavily on” the 2005 country report for Iran published by the State Department. Reyes-Sanchez v. U.S. Att’y Gen., 369 F.3d 1239, 1243 (11th Cir.2004). The report stated that “[s]ome unofficial estimates indicated that there were approximately 100 thousand Muslim-born citizens who converted to Christianity,” but that “there were no reported instances of the death penalty being applied for apostasy during the year.” There was one “unconfirmed report on Christian Web sites that on November 22, unidentified persons killed a man who had converted to Christianity more than 10 years earlier.” The report also stated that, on December 19, a Baha’i apostate, who “was arrested in 1995 and faced a life sentence for apostasy,” “died in prison of unknown causes” and that “[t]wo other Baha’is were in prison at year’s end, including [one] who .... was sentenced to three years in prison for activities against the security of the state and spreading falsehoods.” If the record contained only this evidence of religious persecution, then we would be hard-pressed to overturn the decision of the Board that Kazemzadeh failed to prove a pattern or practice of religious persecution.
The problem with the decision of the Board is that it failed to consider two important aspects of the record. Kazemzadeh offered evidence about religious persecution and his personal encounters with the Iranian regime that neither the Board nor the Immigration Judge mentioned in reference to Kazemzadeh’s conversion. As a result, the Board did not give “reasoned consideration” to Kazemzadeh’s application or make “adequate findings.” Tan, 446 F.3d at 1375 (internal quotation marks omitted).
First, neither the Board nor the Immigration Judge considered Kazemzadeh’s testimony that Iranians who convert from Islam to Christianity “practice underground.” We agree with the decision of the Seventh Circuit that having to practice religion underground to avoid punishment is itself a form of persecution. See Muhur v. Ashcroft, 355 F.3d 958, 960-61 (7th Cir.2004) (Posner, J.). We have recognized that “the [Immigration and Nationality Act] and related regulations ... do not require applicants ... to avoid signaling to others that they are indeed members of a particular race, or adherents of a certain religion, etc.” Antipova v. U.S. Att’y Gen., 392 F.3d 1259, 1264-65 (11th Cir.2004). The Board relied on the 2005 country report to find that Kazemzadeh failed to *1355 prove that the law against apostasy is often enforced, but the Board did not consider whether enforcement is rare because apostates practice underground and suffer instead that form of persecution to avoid detection and punishment. We are unpersuaded by the dissent that “the necessity of practicing underground is not of concern in this case” because “[i]t seems implausible that the near-total absence of documented persecution of apostates in Iran is due simply to the fact that the 100,000 Christian converts are able to keep their Christianity under wraps.” The unofficial estimate of 100,000 Christian converts in Iran represents only 0.147 percent of the total population of Iran in 2005. We cannot say that it is implausible that such a small minority would be able to avoid punishment by concealing their religion.
Second, although the Board is correct that there is no evidence that anyone in Iran knows about Kazemzadeh’s conversion, neither the Board nor the Immigration Judge considered whether Kazemzadeh is a person about whom the Iranian regime already has a heightened interest. Kazemzadeh testified that when he was in Iran he was arrested, detained, beaten, and monitored because of his political activities. Kazemzadeh also testified that he was expelled from the university he attended in Iran “for not following the Islamic tradition” and was sentenced in absentia after he left Iran to six years of imprisonment for his participation in anti-government activities. Kazemzadeh testified that his father had been a high school philosophy teacher, but was no longer allowed to hold a government position because he was involved with an “anti-government group” and “tried to convince the other students to follow his ideal.” Kazemzadeh testified that in 1988 the Iranian government arrested his father, detained him for five days, tried and convicted him in absentia upon his release, discharged him from his teaching position, and barred him from future government employment. Kazemzadeh also testified that his sibling was unable to work because of his father’s activities. The Board and the Immigration Judge considered this evidence with reference to Kazemzadeh’s application based on political persecution, but this evidence was also relevant to Kazemzadeh’s application for asylum based on religious persecution. Neither the Board nor the Immigration Judge mentioned whether the evidence that Kazemzadeh is a person about whom the Iranian regime already has a heightened interest makes it more likely that Kazemzadeh’s religious conversion will be discovered and become a basis for persecution should he return to Iran.
The dissent argues that our decision to remand so the Board can consider these aspects of the record “is contrary to the deference we traditionally afford Immigration Courts in reaching the ultimate decision,” but we disagree. Although the dissent states that “we typically do not require Immigration Judges or the Board to explicitly address every particular consideration in their opinions,” a remand is necessary when the record suggests that the Board failed to consider important evidence in that record. Tan, 446 F.Sd at 1374. That is the case here.
IV. CONCLUSION
Kazemzadeh’s petition for review is DENIED in part and GRANTED in part. We DENY the petition as to Kazemzadeh’s claims of persecution and a well-founded fear of persecution based on his political opinion. We GRANT the petition as to Kazemzadeh’s claim of a well-founded *1356 fear of persecution based on his religion, VACATE the decision of the Board about that claim, and REMAND for further proceedings consistent with this opinion.