[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 09-12175
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 29, 2009
THOMAS K. KAHN
CLERK

Agency No. A071-847-923

DAN LIXANDRU,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
_____

(December 29, 2009)

Before TJOFLAT, BIRCH and WILSON, Circuit Judges.

PER CURIAM:

Dan Lixandru, a native and citizen of Romania, petitions for review of the

Board of Immigration Appeals' ("BIA") decision denying his application for asylum and withholding of removal under the Immigration and Nationality Act ("INA"). Lixandru contends that the BIA erroneously concluded that he did not establish past persecution or a well-founded fear of future persecution. Additionally, Lixandru submits that the 15-year delay between the filing of his asylum application and a hearing on the merits violated his due process rights. After thorough consideration of the record, we DENY the petition for review.

## I. BACKGROUND

Lixandru entered the United States from Romania on 5 August 1991 as a non-immigrant B2 visitor with authorization to remain until 4 February 1992. On 27 August 1991, he filed an application for asylum and withholding of removal. his application, Lixandru alleged that he was persecuted in Romania based on his political opinion and that he would be possibly imprisoned if he returned to Romania. In September 2005, Lixandru received a notice to appear before an immigration judge based on his unauthorized stay in the United States since 4 February 1992. Lixandru conceded removability at a March 2006 hearing.

At his merits hearing in April 2007, Lixandru testified to the following. He worked for fourteen years as a civil engineer for the Communist government without incident. He did not belong to a political party and was not active in politics because he disliked the ruling Communist Party. He decided to remain in

2

the United States after his six-month visitor status expired because "all my life I wanted to emigrate from R[o]mania. I didn't like the communist, so that was a good opportunity to apply for Political Asylum." Administrative Record ("AR") at 138.

In 1987, a government intelligence agency called the Securitate twice questioned Lixandru about his hobby, stamp collecting. During the first three-hour interrogation, the Securitate beat Lixandru with their fists, causing scratches and bruises. The Securitate informed Lixandru that it was illegal to send stamps to other countries and that they disapproved of his contact with foreigners. The second interrogation spanned four hours and did not involve any physical harm to Lixandru. The Securitate instead asked Lixandru to identify other Romanians who distributed stamps to foreigners. Lixandru refused to collaborate with the Securitate, stating his opposition to the Communist regime. The Securitate tried to entice him with promises of a "material advantage" but Lixandru resisted. Id. at 173. The Securitate eventually released him without further contact.

In December 1989, Lixandru demonstrated for one day in a mass anti-Communist protest in Bucharest. Various Communist governments in other countries were crumbling during this period. Lixandru was briefly detained for a few hours by the Securitate at the police station, along with "thousands" of others. Id. at 176-77. He managed to escape in the confusion, however, before he could be

3

questioned.

In June 1990, Lixandru participated for a week in another large anti-government demonstration against the new President, a former Communist Party member. The protesters consisted of the intellectuals or "[m]ore educated" people. Id. at 181. The government sent in a different social group, the coal miners or "workers," to disperse the protestors because it was illegal to demonstrate. Id. at 152-53, 180-81. Violence erupted when the miners began fighting with the protestors. Miners beat Lixandru with a club, resulting in scratches and bruises but no broken bones. A doctor treated his injuries with "pills, antibiotics." Id. at 153.

After the June 1990 demonstration, Lixandru had no further incidents involving the government and returned to his job as an engineer with the government. He decided to leave Romania in August 1991 because he "didn't believe in the government. They scared [him.]" Id. at 154. Lixandru stated he has an apartment in Romania but has not been back. In Lixandru's opinion, the Romanian government has remained corrupt and politically unchanged since his departure. He believed he would be imprisoned if he returned. Lixandru admitted that his 21-year-old daughter as well as his father reside in Romania.

Lixandru's wife, who followed her husband to the United States in November 1991, also testified at the hearing. She feared for her husband's safety if he returned to Romania because the government there "knew everyone who went

4

against them." Id. at 202.  After she left Romania and applied for political asylum, the Securitate confiscated her house without compensation.  Id. at 202-03.

Although the IJ found Lixandru credible, the IJ concluded that Lixandru did not suffer past persecution in Romania nor establish a well-founded fear of future persecution.  The IJ therefore denied asylum and withholding of removal under the INA and the Convention Against Torture ("CAT").

The BIA affirmed the IJ's decision.[1]  Based on the IJ's factual findings, the BIA agreed with the IJ's conclusion that the incidents described by Lixandru did not rise to the level of past persecution.  Moreover, the BIA found that the 1987 incident pertaining to Lixandru's stamp trading hobby was not on account of a protected ground.  The BIA also concurred with the IJ's conclusion that Lixandru lacked a well-founded fear of persecution.  The BIA explained that conditions in Romania have greatly improved since Lixandru's departure in 1991, and that Lixandru's daughter and father have remained unharmed in Romania.  Finally, the BIA rejected Lixandru's claim that he was prejudiced by the 15-year gap between the filing of his asylum application and the government's commencement of removal proceedings.

---

[1] The BIA noted that Lixandru did not challenge the denial of CAT protection on appeal. Id. at 3 n.1.  Because Lixandru does not challenge the BIA's denial of CAT relief in his petition for review, he has abandoned this issue.  See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (per curiam).

5

Lixandru now petitions us for review of the BIA's decision. He argues that the cumulative effect of the severe and extreme harm he suffered constituted past persecution on account of his political opinion. He further maintains that the country condition reports corroborate his subjective fear that he will be harmed if he returns to Romania. Finally, he asserts that the government violated his due process right to a fundamentally fair hearing by delaying his hearing for fifteen years, which prejudiced him based on the change in Romania's government.

## II. DISCUSSION

We review both the IJ and BIA's decision, as the BIA expressly agreed with the IJ's factual findings and conclusions. See Lin v. U.S. Att'y Gen., 555 F.3d 1310, 1314 (11th Cir. 2009). All legal conclusions are reviewed de novo. Id. We review all factual findings under the substantial evidence test, "which requires us to affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. (quotation marks and citation omitted). In assessing the evidence, we must draw all reasonable inferences in favor of the agency's decision. See Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1255 (11th Cir. 2006) (per curiam). Furthermore, we may not reverse the BIA's decision unless the record compels it. See Ruiz v. Gonzales, 479 F.3d 762, 765 (11th Cir. 2007).

In order to qualify for asylum based on political opinion, an alien bears the

burden of establishing past persecution or a well-founded fear of future persecution based on his political opinion. See Sepulveda, 401 F.3d at 1230-31; 8 U.S.C. § 1101(a)(42)(A) (2009). The persecution must be on account of the victim's political opinion, not the persecutor's. See Ruiz, 440 F.3d at 1257. Accordingly, the alien must present "specific, detailed facts" demonstrating that his political opinion or activity was "causally connected" to the persecution, or that he has an objective well-founded fear of future persecution based on his political views or activity. Id. at 1258 (quotation marks and citation omitted).

To qualify for withholding of removal under the INA, an alien must show that he "more likely than not" will be persecuted or tortured upon return to his country. Sepulveda, 401 F.3d at 1232 (quotation marks and citation omitted). As this is a more stringent standard of proof than required for obtaining asylum, an alien who is ineligible for asylum is generally precluded from obtaining withholding of removal. See id. at 1232-33.

A. Past Persecution

We first address Lixandru's argument that he suffered severe, extreme harm that rose to the level of persecution. Although the INA does not define persecution, our precedent sets a high threshhold. For example, we have found that an alien was not persecuted when he was arrested while participating in a student demonstration, interrogated and beaten for five hours, detained for four days,

7

subsequently monitored by Iranian authorities, and forced to appear before a university discipline committee and an Islamic court. See Kazemzadeh v. U.S. Att'y Gen., 577 F.3d 1341, 1353 (11th Cir. 2009). At most, we found that Kazemzadeh had been harassed. See id. Similarly, we found that no persecution occurred when an alien was detained for 36 hours after participating in a political rally, during which police officers beat him severely enough to warrant a 2-day hospital stay, several medications, and two weeks of rest. See Djonda v. United States Attorney General, 514 F.3d 1168, 1171, 1174 (11th Cir. 2008). Because Djonda's medical documents indicated he only suffered scratches and bruises, we agreed with the BIA's conclusion that his minor beating and brief detention did not constitute persecution. See id. at 1174.

The incidents described by Lixandru are far less severe than those in Kazemzadeh or Djonda. Lixandru was never detained more than a few hours at a time by the Securitate. When Lixandru refused to become an informant for the Securitate, the Securitate responded with offers of material incentives, not threats or physical abuse. Though the Securitate did inflict scratches and bruises on Lixandru during the first 1987 interrogation, his injuries were not serious enough to require medical treatment. Lixandru again sustained only scratches and bruises when a coal minor beat him during a fight at the 1990 demonstration. Such "minor beatings and brief detentions do not amount to persecution." Djonda, 514 F.3d at

8

1174.  Even considering the cumulative effects of all the harm suffered, the incidents do not rise to the "extreme" level of persecution required by our precedent.  Kazemzadeh, 577 F.3d at 1353 (quotation marks and citation omitted); compare Ruiz, 479 F.3d at 766 (concluding that two beatings, telephone threats, and an 18-day kidnaping cumulatively amounted to past persecution).

Moreover, Lixandru has failed to establish the requisite nexus between his alleged persecution and his political opinion.  See Ruiz, 440 F.3d at 1258.  According to Lixandru's own testimony, the Securitate questioned him in 1987 because his international stamp trading was illegal, not because he was anti-Communist.  In fact, it was not until the second interrogation that Lixandru volunteered the fact that he disliked Communism.  Not only did the Securitate make no attempt to persuade Lixandru to change his political views, but the agents offered him a "material advantage" if he agreed to assist them in locating other international stamp traders.  AR 173.  Thus, the record supports the BIA's finding that the 1987 incidents were not on account of a protected ground under the INA.

Likewise, the 1989 detention and the 1990 beating lack a causal connection to Lixandru's political opinion.  As the IJ found, Lixandru may have been arrested in 1989, along with thousands of others, not because of his political opinion, but merely "as a way to restore order to the streets of Bucharest during a time of tremendous political upheaval."  Id. at 109.  As for the 1990 beating by a coal

9

miner, there is no evidence that the government instructed the miners to beat the demonstrators. Instead, Lixandru testified that the government called in the miners to "send people away" because it was illegal to demonstrate. Id. at 152-53. Lixandru participated in the demonstrations for a week before he was attacked by the miners. Viewing the evidence in the light most favorable to the agency's decision, it is a reasonable inference that the miners beat Lixandru of their own volition because of tension between the two social classes, rather than because of Lixandru's political viewpoint. "[E]vidence that either is consistent with acts of private violence . . . , or that merely shows that a person has been the victim of criminal activity, does not constitute evidence of persecution based on a statutorily protected ground." Ruiz, 440 F.3d at 1258. The record here does not compel a finding that Lixandru was persecuted on account of his political opinion. Accordingly, Lixandru has failed to show that he suffered past persecution on account of a protected ground.

B. Future Persecution

Substantial evidence also supports the IJ and BIA's determinations that Lixandru lacks a well-founded fear of future persecution. Lixandru fears that he will be arrested and imprisoned if he returns to Romania because the government is still corrupt and operating under the same Communist rules. Even if this fear is subjectively genuine, it must also be objectively reasonable. See Ruiz, 440 F.3d at

1257.

Both the IJ and BIA concluded that Lixandru's fear is not reasonable based on the evidence submitted at the hearing, including the State Department's 2006 Country Report. That report states that Romania's communist regime has been replaced by "a constitutional democracy with a multiparty, bicameral parliamentary system." AR at 246. The Presidential election held in 2004 was judged generally "free and fair." Id. Although corruption still exists within the police force, the government has instituted a National Anticorruption Directorate to investigate and prosecute corrupt individuals, including police officers, judges, and other government officials. Additionally, the report indicates that the Romanian government generally obeys the law's prohibition on arbitrary arrest and detention. There were no reports of political prisoners or detainees. Freedom of speech and of the press were protected by law and generally respected by the government, allowing private citizens and journalists to criticize even senior government officials. Libel, insult, and defamation of the country were decriminalized. The record thus contains substantial evidence supporting the IJ and BIA's findings that Romania's political environment, though not perfect, has substantially improved since Lixandru's departure.

Lixandru acknowledges on appeal that Romania is no longer officially Communist and that the Securitate has been replaced by the Romanian Intelligence

Service. ("SRI").  Nevertheless, Lixandru points to a 2006 article in which Romania's former president accused the current president, Traian Basescu, of collaborating in the past with the Securitate.  The former president further accused the SRI of concealing or destroying documents referring to that collaboration.  As the IJ explained, though, even if these accusations were proven true, "a collaborator is not commensurate with a member of an organization."  Id. at 111.  Furthermore, the article does not discuss whether President Basescu is currently espousing or promoting Communist ideas.  The record does not compel us to reverse the IJ's finding that Lixandru has an unreasonable fear of President Basescu.

Lixandru also cites the State Department's finding that the Romanian government has been hindered in its efforts to expose former Securitate officers and informants who remain active in politics and business.  However, the possibility that some Communist idealogues still permeate the Romanian government does not necessarily mean that they will single out Lixandru for persecution.  The IJ found that the police or the Securitate never specifically identified Lixandru as a participant in either the 1989 or 1990 anti-Communist demonstrations.  In fact, Lixandru continued to work unhindered for the Communist government for another year before leaving Romania.  It is unreasonable for Lixandru to fear that he will be imprisoned now for incidents that

occurred 19 years ago, especially when those incidents never resulted in any investigation or prosecution.

Finally, the ability of Lixandru's daughter and father to reside unharmed in Romania undermines the objective reasonableness of his fear of future persecution. See Ruiz, 440 F.3d at 1259. We therefore conclude that substantial evidence supports the IJ and BIA's findings that Lixandru failed to establish a well-founded fear of future persecution.

Accordingly, the record does not compel reversal of the BIA's denial of Lixandru's asylum claim. Because Lixandru fails to meet the lower burden of proof required for asylum, he also fails to satisfy the higher standard required to qualify for withholding of removal. See Sepulveda, 401 F.3d at 1232-33.

C. Due Process Violation

In his final argument, Lixandru contends that his due process rights were violated by the government's failure to ensure a timely hearing on his asylum claim. He asserts that the nearly 16-year delay between the 1991 filing of his application and his 2007 hearing prejudiced him because the change in Romania's political conditions resulted in the denial of his asylum claim.

We review constitutional due process challenges de novo. Avila v. U.S. Att'y Gen., 560 F.3d 1281, 1285 (11th Cir. 2009) (per curiam). A due process violation requires the deprivation of a liberty interest without due process of law,

13

and that the error substantially prejudiced the petitioner by affecting the outcome of the proceedings.  See id.  It is well-established that an alien has a due process right to a full and fair deportation hearing.  See Ibrahim v. U.S. I.N.S., 821 F.2d 1547, 1550 (11th Cir. 1987).  On the other hand, we have never recognized a cognizable liberty interest in having an alien's asylum application processed in a timely manner.  To the contrary, we have held that "an alien seeking admission into the United States is merely requesting a privilege and has no constitutional right regarding her application for admission."  Alexis v. U.S. Att'y Gen., 431 F.3d 1291, 1295 (11th Cir. 2005).  Furthermore, because aliens have no constitutional right to admission, they possess only those statutory rights bestowed on them by Congress.  See id.  Lixandru does not cite any federal law which requires the government to follow a specific time frame in processing asylum applications.

The Third Circuit rejected a similar due process claim in Mudric v. Attorney General of the United States, 469 F.3d 94, 99 (3rd Cir. 2006).  Mudric applied for asylum in 1993; hearings were held in August 1997 and February 1998.  Mudric, 469 F.3d at 96.  Because conditions in his native Serbia had changed during the approximately four years between the filing of his petition and its processing by the government, Mudric alleged that the government's delay violated his due process rights.  Id. at 98.  Similarly, he asserted that an eight-year delay in processing his mother's petition to remove conditions on her permanent residence

14

violated due process.  Id.  The Third Circuit found that "the various discretionary privileges and benefits conferred on aliens by our federal immigration laws do not vest in aliens a constitutional right to have their immigration matters adjudicated in the most expeditious manner possible."  Id. at 99.  Moreover, "no federal statute or regulation prescribes a hard-and-fast deadline for acting upon immigration applications and petitions."  Id.  Accordingly, the Third Circuit concluded that the government delays did not cause any constitutional injury "because Mudric simply had no due process entitlement to the wholly discretionary benefits of which he and his mother were allegedly deprived, much less a constitutional right to have them doled out as quickly as he desired."  Id.

We agree with the Third Circuit's reasoning and conclusion in Mudric.  In the absence of a cognizable due process right to have his asylum application adjudicated in a timely manner, Lixandru's due process claim must fail.

### III.  CONCLUSION

The record reveals no basis for reversing the BIA's denial of asylum and withholding of removal.  Accordingly, we DENY Lixandru's petition for review.

**PETITION DENIED.**

15