[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-14318
Non-Argument Calendar

_____

Agency No. A201-268-889

JING CHEN,

                                                                      Petitioner,

versus

U.S. ATTORNEY  GENERAL,

                                                                      Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(June 26, 2015)

Before TJOFLAT, MARTIN  and ANDERSON, Circuit Judges.

PER CURIAM:

Jing Chen, a native and citizen of China, seeks review of the Board of

Immigration Appeals ("BIA") order dismissing her appeal of the Immigration

Judge's ("IJ") decision denying her applications for asylum, withholding of removal, and relief under the United Nations Convention Against Torture ("CAT").

Chen entered the United States at an unknown place on an unknown date, without admission or parole. On September 21, 2011, she applied for asylum, withholding of removal, and CAT relief based on persecution for her political opinion and membership in a particular social group. In the statement she attached to her application, Chen stated the following: She was born on August 17, 1989; worked at the Huang Jin Hotel; formed a romantic relationship with a co-worker, Zhilong Huang; married him in March 2009 (illegally because she had not reached age 20); discovered she was pregnant in May 2009; and in July 2009, when her pregnancy became obvious, quit her job and moved in with her parents. On August 9, 2009, Family Planning Officers ("FPO") went to her parents' home, told her they knew she was pregnant and unmarried, took her to hospital and forced her to undergo an abortion. Two days later, FPO officers ordered her to appear for pregnancy tests and family planning education every four months. When she refused to appear for the November 2009 appointment, FPO officers went to the Huang Jin Hotel, where Chen had returned to work following her abortion, and told the hotel manager that if Huang and Chen continued to work there, the FPO would have the police check out the hotel frequently. To avoid that, the manager

2

fired both Huang and Chen. The next day, FPO officers went to Chen's parents' home, seized Chen and took her to the FPO office, where they forced her to submit to an ultrasound procedure to determine if she was pregnant. The officers then reprimanded her and ordered her to pay a fine of 500 renminbi ("RMB"). Chen fled China because she was afraid of the FPO and could not stand the pregnancy tests and the family planning education. She claimed that if forced to return to China, the FPO would persecute her, monitor her behavior, and limit her ability to have children.

Chen supported her asylum application with her birth certificate and a government issued identification, both bearing an August 17, 1989, birth date; a hospital record showing that she had an abortion during the week of August 10, 2009; a receipt indicating that she paid a 500 RMB fine on November 17, 2009, due to a delayed gynecological examination; and a document issued by Huang Jin Hotel stating that it fired Chen on November 16, 2009, "because she was pregnant prior to marriage and had [an] abortion" and because she was fined by the FPO, thus "caus[ing] a bad influence in [the] hotel"; and written statements by Chen's father and Huang corroborating the essence of her statement. Chen also attached excerpts from the 2008, 2009, and 2010 Country Reports on human rights practices in China and a number of news stories about China's one-child policy.

3

Chen was served with a Notice to Appear on October 26, 2011, charging her with removability for being present in the United States without having been admitted or paroled. She admitted removability. An IJ considered the merits of Chen's application at hearings held on November 27, 2012, and June 3, 2013. Chen testified at length.[1] She essentially repeated, albeit in more detail, what she said in the statement appended to her asylum application. For example, she expanded on what occurred after she missed the pregnancy examination scheduled for November 15, 2009. She said that three FPO officers came to the Huang Jin Hotel, informed her that she had missed her scheduled pregnancy test and family planning class, and attempted to take her to the local FPO for the test. When the officers attempted to take her there, Huang intervened and the officers began to beat him. Several co-workers entered the scene and the officers, realizing they were outnumbered, stopped. On November 17, 2009, seven FPO officers came to her parents' home and took her to the FPO where she underwent an ultrasound exam to determine if she was pregnant. The female officer who administered the test insulted her and slapped her on the face, and the FPO fined her 500 RMB. Beginning in March 2010, she kept the subsequent FPO appointments, which were scheduled every four months. Each time she was scolded, insulted and fined 500 RMB.

_____

[1] Chen testified through a translator.

4

At the November 27, 2012, hearing, Chen was questioned extensively about her age. She said that in China, a person's legal age and "factual" age were different. The legal age is one year younger than the factual age. For example, the government would consider her to be 20 when she was 21. Asked if the government would consider her to be 20 on August 17, 2009, when she had the abortion, she responded: "Back then they thought I wasn't old enough," meaning not yet 20. She would be considered 20 "after the new year." Chen said that in China, she would have been considered 20 in February 2011.

Chen testified that she was pregnant and that if returned to China, even to another province, she would be forced to undergo an abortion because she was not married to the father of her expected child, a man without lawful immigration status, whom she met in New York, and the FPO would find her. After asking Chen to explain why she had not married the man, the IJ returned to the age issue. In response to one question, Chen agreed that the Chinese government would consider her two years old on her first birthday. Then she said that she was not old enough, 20, to marry in March 2009. When the IJ observed that since the government would have treated her as two years old on her first birthday, she would have been 20 when she married, Chen said that "the family planning office would recognize the U.S. way of calculating." Before the November 27 hearing adjourned, the IJ announced that he wanted further proof of Chen's age in China in

5

2009, and a definitive explanation of whether the Chinese government uses a person's "factual age" and thus considers a person one year old at birth.

Chen gave birth to a girl following the November 27 hearing, and provided the court with a copy of the birth certificate. She also provided correspondence from the Chinese government confirming that a woman must be 20 to marry and that a person's age is calculated from the date of birth, such that a person is one year old on that date.

At the June 3, 2013, hearing, Chen was questioned further about the age issue and the number of fines imposed when she appeared for pregnancy tests. She was unable to provide receipts for the fines imposed in March and July 2010 because her parents had misplaced them. When asked why she didn't mention the March fine or the July appointment for a pregnancy test in the written statement given with her asylum application, Chen replied that she did mention that she was required "to go back every four months [but] didn't write down the details." In response to her attorney's questioning, Chen testified that she was 19 on August 9, 2009, the day she was forced to have the abortion. Asked why she was so confused in answering questions about her age, she said that her math was "not very good" and that she "calculated wrong."

The IJ found that Chen's testimony was not credible because there were numerous inconsistencies and omissions in her testimony and her written

6

statement, and because she was unresponsive in responding to questions put to her. For example, the IJ found at least one inconsistency regarding her age when she had an abortion in August 2009. Her age was important because Chen alleged that her past persecution was based on the government's belief that she had not reached age 20 when she married Huang. When questioned by her attorney, Chen said that she was 19 at the time; on cross-examination, she said that she was not 20 at the time of her birthday five months later, in August 2009. Later, she said that she was 18 on that birthday because the government did not consider her "factual age." The IJ also found inconsistencies in Chen's testimony about what took place when she went to the FPO office for pregnancy tests and family planning. She initially testified that she had two forced examinations, one in November 2009 and another in March 2010. Later, she stated that she had three forced examinations. The IJ found Chen's testimony regarding the fines the FPO imposed to be inconsistent as well. Chen testified that she was fined on three occasions, while the statement appended to her asylum application indicated that she was fined only once.

The IJ concluded that the evidence she proffered to corroborate her testimony was insufficient to rehabilitate her credibility. The IJ therefore denied her application for asylum, withholding of removal, and CAT relief and ordered her removal to China. Chen appealed the IJ's decision, contending that the record did not support IJ's adverse credibility finding. The BIA disagreed, finding no

7

clear error in the IJ's determination that Chen's credibility was undermined by her inconsistent testimony regarding her age. The BIA also found inconsistencies between the statement Chen filed with her asylum application and her testimony regarding the details of her allegedly forced abortion and the number of fines the FPO imposed. Having reached these findings and conclusions, the BIA dismissed Chen's appeal. Chen then petitioned this court for review.

We review the BIA's decision as the final judgment, unless the BIA has expressly adopted the IJ's decision s its own. *Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1350 (11th Cir. 2009). Where the BIA has explicitly agreed with some of the IJ's findings, we review those findings as if made by both the BIA and the IJ. *Id.*

We review factual findings, including credibility determinations, under the substantial-evidence test. *Chen v. U.S. Att'y Gen.*, 463 F.3d 1228, 1230–31 (11th Cir. 2006). Under that test, we affirm the BIA's factual findings if they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir. 2001) (quotation marks omitted). We consider such evidence, and the inferences it permissibly yields, in the light most favorable to the Attorney General. *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc). In sum, we disregard a finding of fact only if the record compels us to do so. *Chen*, 463 F.3d at 1230–31.

8

The Attorney General or Secretary of Homeland Security has the discretion to grant asylum to an alien who meets the definition of a refugee. 8 U.S.C. § 1158(b)(1)(A). The INA defines a refugee as:

> any person who is outside of any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

*Id.* at § 1101(a)(42)(A). An alien may establish her eligibility for asylum by showing that she was persecuted in the past in her home country on a protected ground; this gives rise to a rebuttable presumption of a well-founded fear of future persecution. *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1230–31 (11th Cir. 2005).

An alien is entitled to withholding of removal under the INA if she can show that her life or freedom would be threatened on account of her race, religion, nationality, membership in a particular social group, or political opinion if she is returned to her country. 8 U.S.C. § 1231(b)(3)(A). "The alien bears the burden of demonstrating that it is more likely than not that she will be persecuted . . . upon being returned to her country." *Sepulveda,* 401 F.3d at 1232 (quotation marks omitted). "This is a more stringent standard than for asylum." *Id.* To obtain CAT relief, an alien must show that it is more likely than not that she will be tortured if

9

removed to her country of origin. 8 C.F.R. §§ 208.16(c)(2), 208.17(a), 208.18(a)(1).

Adverse credibility determinations should be made in consideration of the totality of the circumstances and may be based on: the demeanor, candor, or responsiveness of the applicant for asylum; the inherent plausibility of her account; the consistency between the applicant's written and oral statements; the internal consistency of each statement; and the consistency of the statements with other evidence without regard to whether an inconsistency, falsehood, or inaccuracy goes to the heart of the applicant's application. 8 U.S.C. § 1158(b)(1)(B)(iii). If the IJ makes an adverse credibility finding, the burden shifts to the alien to show that the credibility decision was not supported by "specific, cogent reasons" or was not based on substantial evidence. *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1287 (11th Cir. 2005). A merely tenable explanation for inconsistencies is not sufficient to overturn an adverse credibility finding. *Chen*, 463 F.3d at 1233.

Although some of the BIA's reasons for the adverse credibility finding were specific and cogent, the record as a whole compels reversal. First, Chen's undisputed documentary evidence resolved any inconsistencies as to whether or not she was of legal age to marry when she claimed that the FPO forced her to undergo an abortion. Second, the supporting documentation compellingly corroborated her core claim for relief—that she was persecuted by being forced to

10

undergo an abortion. Finally, the record when viewed as a whole demonstrates that the imperfections in Chen's testimony were the result of confusion and miscommunication and the fact that she was testifying through an interpreter, not the result of any attempt to embellish her testimony or prevaricate.

PETITION GRANTED.