[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAR 12, 2010
JOHN LEY
CLERK

No. 09-10627
Non-Argument Calendar

_____

Agency No. A099-989-621

RAZA ALI KHAN,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(March 12, 2010)

Before EDMONDSON, BIRCH and ANDERSON, Circuit Judges.

PER CURIAM:

Raza Ali Khan, a native and citizen of Pakistan proceeding pro se, petitions us for review of the Board of Immigration Appeals' ("BIA") decision dismissing his appeal from the Immigration Judge's ("IJ") denial of his application for asylum and withholding of removal under the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1158, 1231(b)(3), and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), 8 C.F.R. § 208.16(c).[1] After careful review, we DENY the petition.

## I. BACKGROUND

On 5 October 2006, Khan filed an application for asylum, withholding of removal, and CAT relief. Administrative Record ("AR") at 300-12. The government subsequently issued Khan a notice to appear ("NTA"), charging him with removability pursuant to INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B) as an alien who remained in the United States for a time longer than permitted. Id. at 726-27. Khan admitted the allegations in the NTA and conceded removability. Id. at 69, 720. In his application and declaration, Khan alleged that he had been persecuted in Pakistan on account of his religious beliefs because he opposed his young son's association with a religious school ("madrasah") that was run by Islamic fundamentalists and led by Mir Alam Shah, a well-known extremist

---

[1] Khan does not challenge the denial of CAT relief in his petition for review and thus we deem this claim abandoned. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) (per curiam).

wanted by the Pakistani and U.S. governments for his ties to terrorist organizations. Id. at 304-05, 318.

At his September 2007 removal hearing, Khan testified that he worked until 2005 as an electrical engineer in Saudi Arabia and first learned his son was attending the madrasah when he returned to Pakistan in the summer of 2003. Id. at 83-86, 93-94. Not wanting his son to attend a fundamentalist religious school, Khan, a self-described "liberal Muslim," met with Shah on 7 December 2003 and asked Shah to release his son from the madrasah. Id. at 84, 96-98, 126-27, 131. Shah refused, telling Khan that Khan was the enemy of Islam and that he and his son would be killed. Id. at 100-01. Two days after this meeting, on 9 December 2003, Shah was killed during a raid of the madrasah by Pakastani defense forces. Id. at 103-04. Khan remained in Pakistan for about three weeks after Shah was killed, but returned to Saudi Arabia before the new year. Id. at 132-33.

Khan testified that Shah's followers attacked Khan's family's home in February 2004 while he was in Saudi Arabia. Id. at 104, 133-34. Khan learned from his wife and brother that men armed with rifles entered the home, fired a few rounds, beat his son, and searched the home for Khan. Id. The men said Shah had been killed because of Khan and that they knew Khan had received a large sum of money from the Pakistani government. Id. Khan's family reported the incident but the police did not conduct an investigation. Id. at 105-06.

3

Khan's brother relocated Khan's family to Hasan Abdal some time in February 2004, before Khan returned to Pakistan in March 2004.[2] Id. at 136-37. Shah's followers came to Khan's family's new home in Hasan Abdal on 24 or 26 February, threatened Khan's family, demanded the money they believed Khan had received from the government, and stole some gold and cash. Id. at 107, 109, 111, 137. Khan further stated that the men forced Khan's son to take off his clothes and "abus[ed] him." Id. at 109.

Khan testified that he returned to Pakistan once more in October 2004 to move his family to Lahore. Id. at 112-14. They remained in Lahore for a short period before moving again to Karachi in December 2004. Id. at 114, 116, 118. Khan returned to Saudi Arabia but was terminated from his job in December 2005 for returning to Pakistan so frequently to attend to family matters. Id. at 128. Khan admitted on cross-examination and that he had not had any encounters with Shah's followers during any of the times he traveled back into Pakistan from Saudi Arabia following Shah's death, and that his family has not been directly harmed or threatened by Shah's followers since he moved them to Karachi in 2004. Id. at 152-53, 158-59.

---

[2] Khan initially testified on direct examination that he returned to Pakistan in early March 2004 to relocate his family to Hasan Abdal. Id. at 106-07. He later clarified that the second attack occurred in February, before he had returned to Pakistan, and that his brother, not he, had relocated the family to Hasan Abdal. Id. at 136-37.

At the second hearing, the IJ heard the testimony of Dr. Richard Barnett, an Associate Professor at the University of Virginia and expert in Pakistani history, who testified that, after speaking to Khan and reviewing all the materials in the case, including Khan's asylum application, his own teaching notes, and documents from Amnesty International, it was his opinion that "conditions in Pakistan are extremely risky for Mr. Khan and his family." Id. at 175, 192-93. Dr. Barnett noted that Khan had been "systematically hounded by violent jihadist elements, not just in the Northwest Frontier, but also in other parts of Pakistan," and that "that process will accelerate" if Khan, who has been branded an "unbeliever," returns. Id. at 193. Dr. Barnett admitted that Pakistani authorities occasionally take "concrete steps" against jihadist elements, but "strongly doubt[ed]" that Khan would be protected by Pakistani authorities if he returned to Pakistan, noting that the police are "infiltrated by" and "colluding episodically with the Taliban and jihadists." Id. at 199. When asked why he believed Khan would still be a target after not having lived in Pakistan for the last four and a half years, Dr. Barnett stated that "[f]our years is nothing to them. That's like yesterday to them. They have a very green memory of what he did, what they allege he did." Id. at 246. Dr. Barnett further explained that Khan, a secular Muslim with his own businesses and land, is "a wonderful target of opportunity." Id. at 200. According to Dr.

Barnett, paying off Khan's persecutors would not prevent further harassment, however, because the jihadists

> don't operate by the rules of civil society. It's . . . a matter of religious campaigning . . . . [Khan] has been declared a kaffir, an unbeliever. He is fair game for anything. Extortion, kidnaping, violence, threats, calls in the middle of the night, people gathering outside his house and shooting off their kalishnakovs. Anything is likely to happen if he goes back.

Id. at 200-01. Dr. Barnett stated that while the relationship between Khan and Shah's followers could be described as a personal vendetta, it was "more than that . . . . This is a religious crusade . . . . [that] will not cease until Islamic law has been established in Pakistan." Id. at 201. With respect to Khan's family's safety in Karachi, Dr. Barnett opined that they would be in danger if their location were to be discovered because the Taliban "roam freely" in Karachi and have access to both the police and the ISI, Pakistan's intelligence agency. Id. at 203. Specifically, Khan and his family will be targets for violence, extortion, and kidnapings. Id. at 201.

Dr. Barnett admitted that Khan had gone to Saudi Arabia several times after Shah's death and that nothing had happened to him any of the times he returned to Pakistan. Id. at 237. Dr. Barnett further admitted that neither Khan nor any members of his family had been confronted by Shah's followers since Khan's

6

family left the Northwest Province, but noted that Khan's family had been in hiding that entire time.[3] Id. at 240, 247-48.

At the close of the evidence, the IJ issued a written decision denying Khan's application for asylum, withholding of removal, and relief under the CAT. Id. at 37. Although the IJ found that Khan was not credible,[4] she addressed the merits of his claims and concluded that Khan was not eligible for relief from removal because he had not demonstrated that he was persecuted in the past or will be persecuted in the future on account of a protected ground. Id. at 60.

Khan appealed the IJ's decision to the BIA, arguing, inter alia, that the IJ erred in finding him incredible; in focusing Dr. Barnett's testimony on the particulars of Khan's claim, rather than the general country conditions in Pakistan; and in finding that there was no nexus between Khan's alleged persecution and his religious beliefs. Id. at 18-22, 30-32. Khan further asserted that the IJ was

---

[3] Dr. Barnett also made a written declaration, which was submitted into evidence, concluding that "the unique circumstances of Mr. Khan's case, coupled with chronic country conditions in Pakistan, make it extremely likely that he will persecuted and even tortured if he is forced to return to Pakistan." Id. at 436-55.

[4] In making this determination, the IJ found that Khan failed to overcome his lack of credibility with sufficient corroborating evidence, noting specifically that Dr. Barnett was "not an expert in current Pakistani affairs" and had "no independent information to corroborate" Khan's specific claims. Id. at 54-55. The BIA held on appeal that the IJ did not err in giving limited weight to Dr. Barnett's testimony because the IJ explained her reasons for doing so and "[i]ssues regarding the weight of testimony are within the province of the factfinder." Id. at 3 n.2.

7

predisposed to denying his application and that he was deprived of "a fair judicial hearing." See id. at 21-22.

The BIA affirmed the IJ's adverse credibility determination, but held in the alternative that, even assuming the credibility of Khan's testimony, Khan's claims failed on the merits because the incidents of harm Khan alleged did not rise to the level of past persecution and because Khan had not established a well-founded fear of future persecution. Id. at 3. With respect to the latter determination, the BIA noted, inter alia, that the objective reasonableness of Khan's alleged fear was undermined by the fact that his family remains in Pakistan and has not been threatened or harmed by Shah's followers since 2004. Id. This petition for review followed.

## II. DISCUSSION

When the BIA issues a decision, we review only that decision, except to the extent that the BIA expressly adopts the IJ's decision. Al Najjar v. Aschroft, 257 F.3d 1262, 1284 (11th Cir. 2001). "Insofar as the [BIA] adopts the IJ's reasoning, we . . . review the IJ's decision as well." Id. Because the BIA rendered its own decision and did not expressly adopt the IJ's reasoning, we review only the BIA's decision.

We review legal conclusions de novo and factual findings under the substantial evidence test, which requires us to affirm the BIA's decision if it is

8

"supported by reasonable, substantial, and probative evidence on the record considered as a whole." Forgue v. U.S. Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005) (quotation marks and citation omitted). Under this highly deferential standard, we view the record in the light most favorable to the BIA's decision and are bound by that decision unless a reasonable adjudicator would be compelled to conclude to the contrary. See Adefemi v. Ashcroft, 386 F.3d 1022, 1026-27 (11th Cir. 2004) (en banc). Accordingly, "even if the evidence could support multiple conclusions, we must affirm the agency's decision unless there is no reasonable basis for that decision." Id. at 1029.

On appeal, Khan argues that the IJ's adverse credibility determination was erroneous, that "current affairs" in Pakistan support his claims for relief, and that the IJ deprived him of a fair hearing by "vicious[ly]" prolonging his case for the purpose of "breaking [his] back and pocket[s]," refusing to allow him to provide his own translator, and rejecting Dr. Barnett's opinion. See AR at 4-8, 10.[5] We do not consider Khan's claims that the IJ improperly prolonged his case and refused to allow him to provide his own translator because he did not raise them

_____

[5] Although Khan appears also to challenge the IJ's finding that there was no nexus between the alleged persecution and Khan's religious beliefs, the BIA did not accept, let alone rely upon, this finding in rendering its decision and it is thus not subject to review. See Al Najjar, 257 F.3d at 1284.

before the BIA.  See Amaya-Artunduaga v. U.S. Att'y Gen., 463 F.3d 1247, 1250-51 (11th Cir. 2006) (per curiam).

We also need not address the IJ's and BIA's adverse credibility determinations because we agree with the BIA's alternative holding that, even if credible, Khan failed to demonstrate past persecution or a well-founded fear of future persecution.  To establish eligibility for asylum, the applicant bears the burden of proving, with credible evidence, that he was (1) persecuted in the past on account of race, religion, nationality, membership in a particular social group, or political opinion; or (2) has a well-founded fear of future persecution on account of a statutorily-protected ground.  See 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 208.13(a), (b); see also Chen v. U.S. Att'y Gen., 463 F.3d 1228, 1231 (11th Cir. 2006) (per curiam).[6]

Although the INA does not define "persecution," we have held that it is "an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation" and that "mere harassment does not amount to persecution." Kazemzadeh v. U.S. Att'y Gen., 577 F.3d 1341, 1353 (11th Cir. 2009) (quotation

---

[6] To establish eligibility for withholding of removal under the INA, an applicant must demonstrate that it is "more likely than not" that she will be persecuted upon returning to her home country on account of a protected ground.  Fahim v. U.S. Att'y Gen., 278 F.3d 1216, 1218 (11th Cir. 2002) (per curiam) (quotation marks and citation omitted).  Because "[t]his standard is more stringent than the well-founded fear of future persecution required for asylum," Tan v. U.S. Att'y Gen., 446 F.3d 1369, 1375 (11th Cir. 2006) (quotation marks and citation omitted), an applicant who fails to establish eligibility for asylum is generally precluded from qualifying for withholding of removal, see Al Najjar, 257 F.3d at 1292-93.

10

marks and citation omitted). Khan testified that he was threatened by Shah and that on two separate occasions, Shah's followers, armed with rifles, came to Khan's family's home in Pakistan, demanded money, and stole cash and jewelry. On one occasion, Shah's followers humiliated Khan's son by forcing him to remove his clothes. Khan, who was in Saudi Arabia during both incidents, was never physically harmed by his alleged persecutors. This evidence simply does not compel a finding that Khan suffered past persecution on account of his religious beliefs or any other protected ground. See, e.g., Djonda v. U.S. Att'y Gen., 514 F.3d 1168, 1171, 1174 (11th Cir. 2008) (finding no persecution where alien was detained for thirty-six hours and beaten by police officers but suffered only minor injuries); Zheng v. U.S. Att'y Gen., 451 F.3d 1287, 1290-91 (11th Cir. 2006) (per curiam) (finding no persecution where alien was detained for five days, forced to watch reeducation videos, stand in the sun for two hours, and sign a pledge to no longer practice his religion); Barreto-Claro v. U.S. Att'y Gen., 275 F.3d 1334, 1340 (11th Cir. 2001) (finding no persecution where alien lost his job and was forced to take menial work but was never physically harmed, arrested, or detained).

An applicant who has not demonstrated past persecution may be eligible for asylum by establishing a well-founded fear, based on specific, detailed facts, that he will be singled out for persecution on account of a protected ground if he is returned to his country of origin. See 8 C.F.R. § 208.13(b)(2); Al Najjar, 257 F.3d

11

at 1287. The applicant's fear must be both subjectively genuine and objectively reasonable. Al Najjar, 257 F.3d at 1289.

Substantial evidence supports the BIA's determination that Khan did not establish a reasonable possibility that he will be persecuted on account of his religious beliefs if returned to Pakistan. We agree with the BIA that the fact that neither Khan nor his family has had any encounters with Shah's followers since 2004 demonstrates that Khan's fear of persecution, even if subjectively genuine, is not objectively reasonable. See id. Finally, Khan's argument that the IJ improperly dismissed Dr. Barnett's testimony is likewise unavailing. As the BIA correctly noted, the IJ was entitled to assign as much or as little weight to Dr. Barnett's testimony as she deemed appropriate, and there is nothing in the record to suggest that the IJ's decision with regard to how much weight to give Dr. Barnett's testimony was clearly erroneous.

In sum, the record does not compel the conclusion that Khan suffered past persecution or has a well-founded fear of future persecution. Inasmuch as Khan has failed to establish eligibility for asylum, he cannot meet the more stringent standard required for withholding of removal or CAT relief. See id. at 1292-93.

### III. CONCLUSION

Khan petitions us for review of the BIA's decision dismissing his appeal from the IJ's denial of asylum, withholding of removal, and CAT relief. For the foregoing reasons, we DENY the petition.

**PETITION DENIED.**