[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-15857
Non-Argument Calendar

_____

Agency No. A200-616-773

MARIA DEL PILAR LEYVA GONZALEZ,
HUGO NAVARRO CASTRO,
HUGO NICOLAS NAVARRO LEYVA,
HUGO ESTEBAN NAVARRO LEYVA,
ANDREA DEL PILAR NAVARRO LEYVA,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(July 17, 2015)

Before JORDAN, JULIE CARNES, and JILL PRYOR, Circuit Judges.

PER CURIAM:

Petitioners Maria Del Pilar Leyva Gonzalez ("Leyva") and her husband and three minor children (collectively "Petitioners"), natives and citizens of Colombia, seek review of the Board of Immigration Appeals's ("BIA") final order affirming the Immigration Judge's ("IJ") denial of asylum, withholding of removal, and relief under the United Nations Convention Against Torture ("CAT"). After review, we dismiss the petition for review in part and deny in part.

## I. Factual Background

In March 2011, Petitioners arrived in the United States and Leyva immediately requested asylum. After Leyva's "credible fear" interview, Petitioners were paroled into the United States and the Department of Homeland Security issued each Petitioner a notice to appear that charged each with removability, pursuant to 8 U.S.C. § 1182(a)(7)(A)(i)(I), for being an immigrant not in possession of a valid entry document. In removal proceedings, Petitioners conceded that they were removable as charged and filed applications for asylum, withholding of removal, and CAT relief.[1]

The IJ conducted a merits hearing on Petitioners' applications at which Leyva, her husband, and her former co-worker testified. According to Leyva's credible testimony, she had worked for 21 years as an intelligence officer with

---

[1] Although Leyva's husband and three children each submitted their own asylum application, their claims for relief are based entirely on the events experienced by Leyva.

2

Colombia's Department of Administrative Security ("DAS").[2]  From 2006 until her July 2009 retirement, Leyva was one of the 12 investigators and prosecutors investigating the financial wing of the El Loco Barrera drug cartel, which was led by Daniel Barrera Barrera ("Barrera").  In April 2008, Leyva learned of a verbal threat against those involved in the El Loco Barrera investigation.  Two informants relayed to the investigation's director, who was in Bogota, that Barrera was looking for the government officials who were investigating his organization. Leyva believed this threat was directed at her and another female investigator because the threat specifically referenced prominent females in Villavicencio and Bogota, and Leyva was the only high-ranking female investigator in Villavicencio. The threat indicated that the El Loco Barrera organization was planning to kidnap either the investigators or members of their family.  DAS conducted a risk assessment, which resulted in officers sporadically patrolling the area around Leyva's home.  Leyva also used the detectives who worked under her to protect her.

Over a year later, in July 2009, Leyva retired from her position with DAS because she was concerned about her safety.  Subsequently, in December 2009, another investigator was killed outside of his home by the El Loco Barrera cartel. In February 2010, a threat was sent via the mail to the investigation's section

---

[2]  According to Leyva and her former co-worker, DAS is the Colombian equivalent to the CIA.

director in Villavicencio.  The letter mentioned Leyva's name and stated that "[y]ou will see what will happen with those who interfere with the patron.  Our most heartfelt condolences to her."  Because Leyva had retired, she did not learn of this threat until April 2010 when she reported to the section director that she had received a threat at her home.  The April 2010 threat arrived at Leyva's home in an envelope with her name on it.  The piece of paper inside the envelope stated that "[i]nformation pays, but with death" and that Leyva should stop interfering "with the Patron's employees."  The envelope also included a flier with a picture of Barrera and one of his high-ranking lieutenants who was in charge of the enforcement arm of the El Loco Barrera cartel.  Because Leyva had retired, DAS did not provide Leyva and her family with any protection, but told her that she could report the threats to the prosecutor's office, which she did.

As a result of the April 2010 threat, Leyva moved her family to an enclosed condominium in an isolated area of Villavicencio.  Leyva's children continued to attend the same school and participate in their extracurricular activities—soccer games and practice and music lessons and performances—multiple times a week. Leyva and her husband were not overly concerned about their children's safety, but they did try to minimize the risk by taking a taxi.  However, her oldest son would ride his bike four blocks to the soccer field.  In October 2010, Leyva testified at the

4

trial of the El Loco Barrera cartel member Wilmer Ospina, Barrera's second-in-command.

In January 2011, Leyva found a threat written on a napkin under the rug at the house that her family lived in before moving into the condominium. The message called Leyva a "son of a bitch" and threatened to kill her. When Leyva reported this threat to the prosecutor's office, she learned that the prior threats had not been investigated. Leyva then contacted a colleague with the U.S. Drug Enforcement Agency ("DEA") who told her to come to Bogota. Once in Bogota, Leyva's DEA contact provided her with $5,000 to buy plane tickets for her family to travel to the United States. Leyva feared that she would be killed if she returned to Colombia because she was still a witness against members of the El Loco Barrera cartel. Plus, through a magazine article, Leyva had learned that Barrera had information about all of the DAS investigators because he had purchased a database containing the investigators' names and home addresses.

The testimony of Leyva's husband and former DAS co-worker, Lilianeli Mora Salamanca, corroborated Leyva's testimony about the threats. Salamanca had worked with Leyva on the El Loco Barrera investigation. While she was afraid, Salamanca and her son continued to live in Bogota, Colombia without any issues, but she did take steps to protect herself and her son. Salamanca and her son

5

lived in a building with security, reported suspicious vehicles to the police, and avoided going to social events.

At the end of the hearing, the IJ requested that the parties submit written closing arguments. After the parties submitted their written closing arguments, but before the IJ issued a decision, the government moved to supplement the record with additional evidence that reflected that Barrera had been arrested in Venezuela and was soon to be extradited to Colombia. In a written decision, the IJ denied Petitioners' applications and ordered them removed to Colombia. The BIA affirmed the IJ's decision. Before this Court, Petitioners contend that (1) the IJ procedurally erred and violated their due process rights by relying on the evidence submitted by the government after closing arguments to deny their claim; (2) the IJ and BIA erred in denying Petitioners' asylum applications based on the finding that Petitioners did not establish past persecution or a well-founded fear of future persecution; and (3) the IJ and BIA erred in denying their applications for withholding of removal and CAT relief.

## II. Discussion

We review *de novo* our own subject matter jurisdiction. *Gonzalez-Oropeza v. U.S. Att'y Gen.*, 321 F.3d 1331, 1332 (11th Cir. 2003). A court may not review a final order of removal unless "the alien has exhausted all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1). If a petitioner has failed

to exhaust her administrative remedies by not raising an issue in her appeal brief to the BIA, we lack jurisdiction to consider the claim. *Amaya-Artunduaga v. U.S. Att'y Gen.*, 463 F.3d 1247, 1250-51 (11th Cir. 2006). To properly exhaust a claim, the alien must raise the issue in such a way as to give the agency a "full opportunity" to consider the claim and compile a record adequate for judicial review. *Id.* at 1250.

Here, we lack jurisdiction over Petitioners' argument that the IJ procedurally erred and violated their due process rights by considering the evidence submitted by the government after closing arguments. Petitioners did not exhaust this argument by raising it in their appeal to the BIA, but instead are raising it for the first time on appeal. Similarly, Petitioners' concession before the IJ that they were ineligible for CAT relief rendered that claim unexhausted, because they did not give the agency a full opportunity to consider it and compile a record adequate for judicial review.[3] *See Amaya-Artunduaga*, 463 F.3d at 1250-51. Accordingly, we dismiss Petitioners' petition for review as to these issues.

---

[3] In Petitioners' written closing argument, Leyva acknowledged that it did not appear that she was eligible for CAT relief. In light of this concession, the IJ denied Petitioners' requests for CAT relief without considering Petitioners' eligibility. Likewise, in affirming the IJ's decision, the BIA did not consider the merits of Petitioners' CAT claim, but rather noted that Leyva had previously acknowledged that she was not eligible for CAT relief. Petitioners have not argued on appeal that the IJ and BIA erred in their conclusion that Petitioners previously conceded ineligibility for CAT relief, but instead argue that they are eligible for CAT relief based on the facts of their case.

As to Petitioners' remaining arguments, we review factual determinations under the substantial evidence test. *Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1350 (11th Cir. 2009). Under the substantial evidence test, we draw every reasonable inference from the evidence in favor of the decision, and reverse a finding of fact only if the record compels a reversal. *Id.* at 1351. We must affirm if the BIA's decision is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* The fact that the record may support a contrary conclusion is insufficient to reverse. *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004) (*en banc*).

An applicant for asylum must meet the Immigration and Nationality Act's ("INA") definition of a refugee. 8 U.S.C. § 1158(b)(1). The INA defines a refugee as a person who cannot return to his or her home country due to "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A). To establish eligibility for asylum, an applicant must demonstrate either past persecution, or a well-founded fear of future persecution, based on a statutorily listed factor. *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1257 (11th Cir. 2006). If the applicant demonstrates past persecution, there is a rebuttable presumption that she has a well-founded fear of future persecution. *Id.*

8

If the applicant cannot demonstrate past persecution, she must demonstrate that her well-founded fear of future persecution is subjectively genuine and objectively reasonable. *Id.* "The subjective component is generally satisfied by the applicant's credible testimony that he or she genuinely fears persecution[,]" and "[i]n most cases, the objective prong can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution." *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1289 (11th Cir. 2001) (quotation omitted). The fact that an applicant's relatives remain in her home country unharmed can be evidence in support of a conclusion that the alien does not have an objective fear of future persecution. *See Ruiz*, 440 F.3d at 1259.

To qualify for withholding of removal, an applicant must establish that her life or freedom would be threatened in her country of origin on account of the alien's race, religion, nationality, membership in a particular social group, or political opinion. 8 U.S.C. § 1231(b)(3)(A). The applicant must demonstrate that she would "more likely than not" be persecuted upon being returned to her country of origin. *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1232 (11th Cir. 2005). This standard is more stringent than the "well-founded fear" standard for asylum. *Id.* An alien cannot meet the higher standard for withholding of removal if she does not meet the lower asylum standard. *Al Najjar*, 257 F.3d at 1292-93.

We have held that "persecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation, and that mere harassment does not amount to persecution." *Sanchez Jimenez v. U.S. Att'y Gen.*, 492 F.3d 1223, 1232 (11th Cir. 2007). We have concluded that threats in conjunction with brief detentions or a minor physical attack that did not result in serious physical injury do not rise to the level of persecution. *See, e.g., Kazemzadeh*, 577 F.3d at 1353 (arrest, five-hour interrogation and beating, followed by four-day detention was not persecution); *Djonda v. U.S. Att'y Gen.*, 514 F.3d 1168, 1171, 1174 (11th Cir. 2008) (36-hour detention, beating and threat of arrest was not persecution).

On the other hand, we have found persecution based on repeated death threats accompanied by the attempted kidnapping of an applicant's daughter and the attempted murder of the applicant, whose moving vehicle was shot at multiple times, albeit the latter was not struck or physically injured. *See Sanchez Jimenez*, 492 F.3d at 1233. We have also held that an applicant suffered past persecution based on the totality of circumstances occurring over an 18-month period, including verbal death threats, an attempted attack, and one attack by three gunmen who threw the applicant to the ground, hit him with the butt of a rifle, and broke his nose. *Mejia v. U.S. Att'y Gen.*, 498 F.3d 1253, 1257-58 (11th Cir. 2007). In addition to in-person threats or violence against an applicant, we have held that

10

threats against others can support a claim of past persecution where the threat "concomitantly threatens" the applicant. *De Santamaria v. U.S. Att'y Gen.*, 525 F.3d 999, 1009 & n.7 (11th Cir. 2008) (finding past persecution where the applicant suffered "repeated death threats, two physical attacks [which resulted in minor physical injuries], the murder of a family friend, and a kidnapping cut short only by a harrowing escape").

Here, substantial evidence supports the IJ and BIA's finding that Leyva failed to establish past persecution. Leyva's testimony establishes that, over an approximately three-year period, she was threatened four times—two threats were sent to her former employer DAS and she received two written threats at her home. Based on our precedent, we cannot conclude that these four threats compel a conclusion that Leyva was persecuted in the past. *See Kazemzadeh*, 577 F.3d at 1353; *Djonda*, 514 F.3d at 1174. Petitioners' case is distinguishable from those in which we have found that the record compels a conclusion that the petitioner suffered past persecution. Unlike *De Santamaria*, *Sanchez Jimenez*, and *Mejia*, this is not a case where the threats against Leyva were accompanied by attacks or attempted attacks on Leyva or her family members. *See De Santamaria*, 525 F.3d at 1009; *Mejia*, 498 F.3d at 1257-58; *Sanchez Jimenez*, 492 F.3d at 1233.

Substantial evidence also supports the determination that Petitioners failed to demonstrate a well-founded fear of future persecution. Because Leyva did not

11

establish past persecution, there is no presumption that she has a well-founded fear of future persecution.  *See Ruiz*, 440 F.3d at 1257.  Both Leyva and Salamanca testified that most of the people involved in the El Loco Barrera investigation (and thus similarly situated to Leyva) remain in Colombia unharmed.  Salamanca herself remained in Colombia and she had not received any threats, been attacked, or had any attempted attacks on herself or her family.  Leyva's former supervisor retired from DAS and, at the time of the hearing, was the mayor of a municipality in Colombia.  Additionally, as the IJ and BIA correctly noted, Leyva's father and siblings, as well as her husband's parents and siblings, remain in Colombia unharmed.  *See Ruiz*, 440 F.3d at 1259.

For all these reasons, the BIA did not err in denying Petitioners' asylum applications.  Because Petitioners failed to show her eligibility for asylum, the BIA correctly concluded that Petitioners also failed to meet the higher standard of proof for withholding of removal.  *See Al Najjar*, 257 F.3d at 1292-93.  Accordingly, we deny the petition as to these issues.

**PETITION DISMISSED IN PART, DENIED IN PART.**