[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-14640
Non-Argument Calendar
_____

Agency No. A215-975-080

NURUL ISLAM,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(June 24, 2020)

Before WILSON, ROSENBAUM, and ANDERSON, Circuit Judges.

PER CURIAM:

Nurul Islam petitions for review of the Board of Immigration Appeals'

("BIA") dismissal of his appeal from an Immigration Judge's ("IJ") decision

denying his application for asylum and withholding of removal.[1]  The BIA concluded that Islam's testimony was not credible and that, even if his testimony was credible, he failed to show that he had suffered past persecution or had a well-founded fear of future persecution.  After careful review, we grant the petition.

## I.

Islam, a native and citizen of Bangladesh, was charged with being removable because he entered the United States without authorization.  Islam admitted those allegations and conceded removability.  Through counsel, he filed an application for asylum and withholding of removal, stating that he had been attacked and threatened by members of the Awami League ("League"), the ruling political party in Bangladesh, based on his membership in the rival Liberal Democratic Party ("LDP"), and that he feared persecution in Bangladesh.

## A.

At the merits hearing, Islam testified as follows.  He was a 40-year-old Bangladeshi native who left his wife and three children in Bangladesh because he believed the present government and ruling party would kill him for his political

---

[1] Islam also applied for relief under the United Nations Convention Against Torture ("CAT"), but the BIA concluded that this claim had been waived because Islam did not raise it in his brief challenging the IJ's decision.  Although Islam now contends that the BIA erred in dismissing this claim, we lack jurisdiction to review an issue that was not raised before the BIA. *Indrawati v. U.S. Att'y Gen.*, 779 F.3d 1284, 1297 (11th Cir. 2015); *see* 8 U.S.C. § 1252(d)(1). And here, Islam failed to address the denial of his claim for CAT relief before the BIA, so we lack jurisdiction to review this claim.  *See Indrawati*, 779 F.3d at 1297.

2

activities with an opposition political party.  He testified about several instances where he was attacked or threatened by League members for his political activities with the LDP.

Islam was first threatened by League members on December 16, 2016.  After he went to an LDP political rally on that date, four or five League members went to his home looking for him.  He was away at the time, and they told his parents that they had seen him at the rally and would kill him if he did not leave the LDP and join the League.

Then, on October 26, 2017, after an LDP meeting, Islam was accosted and attacked by five League members who began punching and kicking him, breaking one of his teeth, and demanding that he join the League.  Bleeding profusely from his mouth, he began screaming for help.  People nearby came to his rescue and then called his father, who took him to the hospital, where he spent one night.  Islam submitted treatment notes from the hospital reflecting that he was "heavily bleeding" from his nose, was bleeding from his mouth, and had "lots of bruises."  Islam reported the attack to the police.  A few days later, several League members approached his father at the market, mentioned the police complaint, and stated that the police were theirs and would not "do anything against us."

In December 2017, Islam was verbally threatened by six to seven League members while putting up LDP posters.  They said they would kill him the next time

3

they saw him working for the LDP, stating that his parents would "not have the chance to see [his] face anymore." Islam did not report this incident to the police because he believed the police were under the control of the League. Several months later, he was again warned by League members that if they saw him advocating for the LDP it "would be really bad for [him]."

On February 21, 2018, Islam and other LDP members were at a monument to commemorate Language Movement Day when they were suddenly attacked by a group of twenty to twenty-five League members. Armed with bamboo sticks, hockey sticks, and metal rods, the League members began "brutally" attacking the LDP members. As he ran away from the attack, Islam was hit on the ankle by a thrown brick, which caused bruising and swelling. Soon after leaving the area, he received a call from a friend telling him not to go home, so he went to his sister's house instead. Later that evening, his father called to say that League members had been by the house looking for him. He stayed with his sister, apparently without incident, for two months.

Islam left Bangladesh soon after League members approached his brother-in-law at the market in late April 2018 and told him that they knew Islam was staying at his home and threatened to kill Islam and harm the brother-in-law and his family if Islam was found there. Then, on Islam's way to the United States, his father called and told him that League members were looking for him and said that they would

4

kill him whenever they found him. Islam's father died later that year from a heart attack, which Islam attributed to stress caused by the League's threats.

On cross-examination, the government asked whether Islam's brother-in-law had been "called" by the League, as he wrote in his translated personal statement, or if his brother-in-law had been approached in person. Islam clarified that this encounter was in person, and he indicated that his (or the translator's) use of the word "call" did not refer to a telephone conversation, stating, "my brother-in-law had been to the bazaar and had seen the people, did call him and say this. And if there is any mistake, I am sorry for that."

In addition to his testimony, Islam's evidence included the following: (1) his personal statement; (2) affidavits from family members and a political colleague that attested to the threats and attacks described in his personal statement; (3) a letter from an LDP member and former member of Parliament stating that he knew Islam well as an active member of the LDP and that the League had continuously tortured, harassed, and killed LDP members since it came into power again in 2008; (4) Islam's police complaint regarding the assault he suffered on October 26, 2017; (5) hospital treatment notes for the injuries Islam suffered on October 26, 2017; (6) a "joining letter" dated May 1, 2015, reflecting Islam's membership in the LDP; and (7) a letter dated October 28, 2017, from the local LDP president to higher-level law-enforcement officials regarding the October 26, 2017 assault.

**B.**

The IJ issued an oral decision denying Islam's application for asylum and withholding of removal and ordering his removal to Bangladesh. The IJ first found that Islam's testimony was not credible or corroborated. The IJ stated that Islam's testimony was inconsistent with his personal statement and at times "vague and nonresponsive" and "rambling," though the IJ did not specify which parts of Islam's testimony were inconsistent, vague, or nonresponsive. Further, the IJ gave no evidentiary weight to the "false" affidavits from Islam's family members because they were nearly exact copies of one another, including the typographical and grammatical errors, which the IJ found "[went] to [Islam's] credibility." Accordingly, the IJ denied Islam's application as not being credible or adequately corroborated.

In the alternative, the IJ concluded that, even if his application was credible and adequately supported, Islam failed to establish that he had suffered past persecution or had a well-founded fear of future persecution. Regarding past persecution, the IJ found that the "vague and general" threats and "minor" assaults Islam suffered did not rise to the level of persecution. As for future persecution, the IJ found that Islam's fear of persecution was not objectively reasonable because "there is no objective evidence that [he] would be subject to harm if he is returned

6

to Bangladesh," noting that he lived at his sister's house without incident after the attack in February 2018.

The BIA affirmed the IJ's decision. The BIA concluded that the IJ's adverse credibility finding was not clearly erroneous, finding that Islam's personal statement was inconsistent with his testimony regarding how his brother-in-law was threatened, and that his testimony was "vague and nonresponsive" at times, though the BIA, like the IJ, gave no further explanation on that point. The BIA also cited the virtually identical affidavits from Islam's family members.

The BIA agreed with the IJ's alternative conclusion that, even if Islam was credible, the physical harm and threats that he had endured due to his political beliefs did not rise to the level of persecution. The BIA stated that Islam "suffered only minor bruising and bleeding" and that the threats he received were "vague and general in nature." The BIA also concluded that Islam's fear of future persecution, while subjectively genuine, was not objectively reasonable, noting that he had lived safely at his sister's house. Finally, the BIA cited an unpublished decision from this Court, *Hossain v. U.S. Att'y Gen.*, 630 F. App'x 914 (11th Cir. 2015), where a panel had concluded that a Bangladeshi citizen alleging persecution by the League failed to prove that the government was unable or unwilling to protect him.

**II.**

7

We review the BIA's decision as the final judgment unless the BIA adopted the IJ's decision. *Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1350 (11th Cir. 2009). Where the BIA agrees with the IJ's reasoning, we will review the decisions of both the BIA and the IJ to the extent of the agreement. *Id.*

We review factual findings, including credibility determinations, under the substantial-evidence test. *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1254–55 (11th Cir. 2006). Review for substantial evidence is deferential and is based on a construction of the record evidence that is most favorable to the agency's decision. *Kazemzadeh*, 577 F.3d at 1350–51. We must affirm the agency's decision "if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* at 1351 (quotation marks omitted). Findings of fact may be reversed only if the record compels a different result. *Id.* In other words, the mere fact that the record may support a different conclusion is not sufficient to justify reversal. *Sanchez Jimenez v. U.S. Att'y Gen.*, 492 F.3d 1223, 1230 (11th Cir. 2007).

### III.

Challenging the adverse credibility determination, Islam argues that the inconsistency cited by the BIA was inconsequential, that the IJ and BIA failed to identify which aspects of his testimony were vague and nonresponsive, and that the similarities between his family members' affidavits, without more, cannot sustain an adverse credibility finding.

8

The applicant bears the burden of showing that an adverse credibility determination "was not supported by specific, cogent reasons or was not based on substantial evidence." *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1287 (11th Cir. 2005). Considering the totality of the circumstances, the agency may base a credibility finding on these factors: the petitioner's demeanor, candor, and responsiveness; the plausibility of the petitioner's testimony; the consistency between the petitioner's oral and written statements; the internal consistency of each statement; the consistency of the petitioner's statements with other evidence in the record; and any inaccuracies or falsehoods in the petitioner's statements. 8 U.S.C. § 1158(b)(1)(B)(iii). Inconsistencies and inaccuracies need not "go[] to the heart of the applicant's claim" to support an adverse credibility finding, *id.*, but they also cannot be "wholly immaterial," *Kueviakoe*, 567 F.3d at 1305 (holding that the petitioner's alternating use of "car" or "truck" regarding an incident was "wholly immaterial" and could not support an adverse credibility finding).

Here, the record compels the conclusion that the adverse credibility determination was not supported by substantial evidence, as the IJ and BIA failed to support their findings with cogent reasons, and the perceived flaws in Islam's testimony and corroborating evidence were insufficient to permit an adverse credibility finding.

9

First, the IJ and BIA failed to cite any specific instance where Islam's testimony was vague, nor did they describe any instance where his testimony was nonresponsive to the questions posed to him. Islam testified about specific instances of assaults or threats by League members, offering the date the incident occurred, the context in which it occurred, the injuries he suffered, the number of League members involved, and other details. This testimony was also corroborated in part by supporting documentation, including medical records and a police complaint regarding the October 26, 2017, assault, as well as statements by LDP members. Although the government points to certain parts of the record as indicative of Islam's unresponsiveness or vagueness upon questioning, he did not fail to respond to questioning with specific details relevant to the questions posed to him. In the examples cited by the government, Islam relates relevant information in a logical, albeit not concise, fashion. One need not be a polished storyteller to be a credible witness. In sum, substantial evidence does not support the finding that Islam's testimony was vague and nonresponsive. *See Forgue*, 401 F.3d at 1287.

Second, we reject the agency's reliance on the purported inconsistency between Islam's personal statement and his testimony regarding how his brother-in-law was threatened—*i.e.*, whether he was "called" or threatened in person. Although an inconsistency need not go to the heart of the petitioner's claim to support an adverse credibility determination, the alleged inconsistency here is similar to the

10

inconsistency we found insufficient in *Kueviakoe*. In that case, we concluded that the petitioner's inconsistent description of a vehicle involved in an attack on the petitioner—whether it was a "car" or a "truck"—was "wholly immaterial," and therefore could not support an adverse credibility finding, because the petitioner's translated written statement and testimony were otherwise consistent with respect to the details of the attack. *Kueviakoe*, 567 F.3d at 1305.

Likewise, here, Islam's written description of the threat to his brother-in-law was translated and substantively identical to his testimony, insofar as both indicated that League members told his brother-in-law that they were aware that Islam was hiding at his sister's house, and they would harm her family and kill Islam if he was found there. Further, as in *Kueviakoe*, it is unclear that there is an actual inconsistency, as Islam testified that League members "did call" his brother-in-law when they saw him in the bazaar, which suggested that he did not consider the terminology to be in conflict. *See id.* (relying on the petitioner's demonstrated "failure to distinguish between the two words"). Thus, as in *Kueviakoe*, the difference in the terminology used to describe how the threat was conveyed by League members is "wholly immaterial" and therefore insufficient to support an adverse-credibility determination. *See id.*

Finally, the IJ and BIA provided no reason in support of their conclusion that the similarity of the affidavits from Islam's family members adversely reflected on

Islam's credibility. The government cites a BIA decision that stands for the proposition that an IJ may infer a lack of credibility where the petitioner "voluntarily and intentionally" submits a fraudulent or counterfeit document. *In re O–D–*, 21 I. & N. Dec. 1079, 1083 (BIA 1998). But Islam asserts that his attorney prepared the affidavits while he was detained, and there is nothing in the record to show that Islam knew what was contained within the affidavits or had any control over their preparation or submission. So we see no good reason why the veracity of these documents—even assuming they could be characterized as "false"—should reflect adversely on the credibility of Islam's testimony. Accordingly, this reason too does not support an adverse credibility finding against Islam.

For these reasons, we hold that the adverse credibility determination is not supported by any of the rationales cited.[2]  *See Kueviakoe*, 567 F.3d at 1305. Nevertheless, Islam is not entitled to relief on this basis alone, in light of the BIA's alternative finding that he failed to establish that the mistreatment he suffered in the past rose to the level of "persecution" or that he had a well-founded fear of persecution if returned to Bangladesh. We turn to that issue now.

---

[2] Although the government points to other alleged inconsistencies in Islam's evidence as reasons to uphold the agency's decision, the government's post-hoc justifications cannot supply a basis for affirming the agency's decision because the agency did not rely on those reasons in denying Islam's application. *See Zahnd v. Sec'y of Dep't of Agric.*, 479 F.3d 767, 773 (11th Cir. 2007) (stating that this Court will not supply a reasoned basis for an agency's decision that the agency itself has not given when reviewing whether that decision is supported by substantial evidence).

## IV.

To qualify for asylum, Islam must prove, with reliable and specific evidence, that he is a "refugee." 8 U.S.C. § 1158(b)(1); *Sanchez Jimenez*, 492 F.3d at 1232. A "refugee" is someone who is unable or unwilling to return to his country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). Asylum eligibility may be established in two ways: (1) demonstrating past persecution based on a protected ground, which creates a rebuttable presumption of future persecution; and (2) demonstrating a well-founded fear of future persecution on account of a protected ground. *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1230–31 (11th Cir. 2005). A "well-founded fear" is one that is both subjectively genuine and objectively reasonable. *Id.* at 1231.

An applicant for withholding of removal must satisfy standards similar to, but more stringent than, those for asylum eligibility. *Rodriguez Morales v. U.S. Att'y Gen.*, 488 F.3d 884, 891 (11th Cir. 2007); *see* 8 U.S.C. § 1231(b)(3)(A). So a failure to establish eligibility for asylum generally means a failure to meet the higher standard for withholding of removal. *Najjar v. Ashcroft*, 257 F.3d 1262, 1292–93 (11th Cir. 2001).

"Our case law establishes that persecution is an extreme concept that does not include every sort of treatment our society regards as offensive." *Shi v. U.S. Att'y*

13

*Gen.*, 707 F.3d 1231, 1235 (11th Cir. 2013) (quotation marks omitted). Simple threats, brief detentions, minor beatings, or isolated incidents of verbal harassment or intimidation generally do not compel a finding of persecution. *See Kazemzadeh*, 577 F.3d at 1353 ("Minor physical abuse and brief detentions do not amount to persecution."); *Djonda v. U.S. Att'y Gen.*, 514 F.3d 1168, 1174 (11th Cir. 2008) (concluding that a threat, a 36-hour detention, and a minor beating did not compel a finding of persecution); *Zheng v. U.S. Att'y Gen.*, 451 F.3d 1287, 1290–91 (11th Cir. 2006) (concluding that a finding of persecution was not compelled by evidence that an alien had been detained for five days, forced to watch reeducation videos, stand in the sun for two hours, and sign a pledge to no longer practice his religion); *Sepulveda*, 401 F.3d at 1231 (stating that persecution requires "more than a few isolated incidents of verbal harassment or intimidation"). Nevertheless, "we are required to consider the *cumulative* impact of the mistreatment the petitioner[] suffered" when assessing past persecution. *Mejia v. U.S. Att'y Gen.*, 498 F.3d 1253, 1257–58 (11th Cir. 2007).

In assessing the BIA's determination that the mistreatment Islam suffered did not rise to the level of persecution, our decision in *Mejia* is instructive. In that case, we found that the record compelled a finding that Mejia, a political activist, had suffered past persecution based on the cumulative impact of escalating threats and attacks. 498 F.3d at 1257. We noted that "Mejia was physically attacked twice:

14

once when a large rock was thrown at him and once when members of the FARC pointed a gun at his head and then broke his nose with the butt of a rifle." *Id.* In view of these assaults, we reasoned that the threats Mejia and his wife received, including a "condolence letter" that referenced his "sure death" after the second assault, "cannot be considered 'isolated.'" *Id.* at 1257–58. "Considering the cumulative effects of the escalating threats and attacks," we concluded that the record compelled a finding of past persecution. *Id.* at 1258.

Considered cumulatively, we conclude that the threats made to Islam and his family members, coupled with the two separate attacks, rose to the level of persecution. Similar to the petitioner's experiences in *Mejia*, Islam was repeatedly threatened with death over an extended period by League members; beaten by League members, resulting in the loss of a tooth and substantial bleeding; struck by a rock thrown at him during a public event at which he and his fellow LDP members were attacked by League members with hockey sticks and metal pipes, and he was told he would be killed via threats made to his family members, both before and after he fled Bangladesh. *See Mejia*, 498 F.3d at 1254–55. Moreover, as in *Mejia*, several of the threats Islam and his family received were around the same time as the two physical attacks, lending credibility to the threats and demonstrating that the threats and attacks "were neither 'isolated' nor simply 'harassment.'" *Id.* at 1257. Given the similarities between the threats and violence that Islam experienced to those

15

described in *Mejia*, the record compels the conclusion that the BIA erred in concluding that the threats and violence that Islam suffered were insufficiently severe to constitute past persecution.

Although the BIA found that the threats Islam and his family received were "vague and general in nature," it did not explain the basis for this conclusion. Nor can we agree with that characterization. Islam's descriptions of the threats were reasonably specific. According to his testimony, in December 2016 and February 2018, League members threatened to kill him if he continued to work for the LDP. In December 2017, League members again threatened Islam's life if he continued to work for the LDP, adding that no one would find his body. The threats against Islam continued after he fled to his sister's home, as League members informed his brother-in-law that they knew that Islam was living at his sister's home, and they would kill Islam and harm her family if he was found there. Finally, League members continued to threaten Islam's life after he fled to the United States. These threats were specific, as they referenced his current whereabouts, what would happen to his body, and his political activities, and the BIA did not provide any basis for its characterization of those threats as vague and general in nature.

For these reasons, we grant Islam's petition to the extent he challenges the adverse credibility determination and the finding that the mistreatment he suffered in Bangladesh did not rise to the level of persecution. We vacate and remand so that

16

the BIA may reconsider in the first instance whether Islam established a well-founded fear of future persecution or withholding of removal in light of the past persecution that he suffered.[3]

**PETITION GRANTED; VACATED AND REMANDED.**

---

[3] Although a petitioner generally must establish that the government is unable or unwilling to protect him, *see Lopez v. U.S. Att'y Gen.*, 504 F.3d 1341, 1345 (11th Cir. 2007) ("Lopez must show not only past persecution or a well-founded fear of future persecution, but also that she is unable to avail herself of the protection of her home country."), we cannot tell whether the BIA found that Islam failed to make this showing. While the BIA cited an unpublished decision from this Court along these lines, *see Hossain v. U.S. Att'y Gen.*, 704 F. App'x 895 (11th Cir. 2017), that citation came in the context of discussing the likelihood of harm to Islam in Bangladesh. And the BIA did not reference the evidence or Islam's arguments in this case. In light of this uncertainty, we believe that permitting the BIA to address this issue on remand is the appropriate course. *See Gonzalez v. Thomas*, 547 U.S. 183, 186 (2006) (explaining that, when an issue has not been decided by the BIA, remand is generally appropriate).

17