[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 24-11423

Non-Argument Calendar

_____

ABDUL OHAB,

Petitioner,

*versus*

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A206-312-483

_____

Before ROSENBAUM, JILL PRYOR, and KIDD, Circuit Judges.

PER CURIAM:

Abdul Ohab seeks review of a final order by the Board of Immigration Appeals ("BIA"), which affirmed an immigration judge's ("IJ") denial of his application for asylum and withholding of removal. Ohab, a member of the Bangladesh National Party ("BNP"), claims he was persecuted based on his political views by members of the Awami League, the former ruling party. He asserts that substantial evidence does not support the denial of asylum and withholding of removal based on an adverse credibility determination. He also argues that, independent of his credibility, the record supports a finding that he has a well-founded fear of future persecution. After careful review, we deny the petition as to the first argument, and we dismiss it as to the second.

## I. Background

Ohab, a native and citizen of Bangladesh, entered the United States in November 2013 without valid entry documents at a designated port of entry. He told immigration officials that he feared returning to his home country of Bangladesh, and he sat for a credible-fear interview with an asylum officer in December 2013.

In his interview, Ohab said that he had been threatened seven times and harmed twice by members of the Awami League because of his active membership in the BNP. The most serious instance of harm occurred on April 4, 2012, when members of the Awami League attacked him with sticks, iron rods, and a knife,

after he had refused their offer to join the Awami League on March 26, 2012.  Ohab reported the attack, but the police refused to take the report because the Awami League was in power.  The asylum officer determined there was a significant possibility that Ohab would be found credible and could establish eligibility for asylum and withholding of removal.

The Department of Homeland Security served Ohab with a notice to appear, charging that he was removable as an applicant for admission without a valid entry document.  *See* 8 U.S.C. § 1182(a)(7)(A)(i)(l).  Ohab conceded removability and applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT").  He submitted various supporting documents, including country condition reports, news articles, letters and affidavits from witnesses in Bangladesh, and a detailed personal affidavit.

A.  *Ohab's Hearing Testimony*

Ohab testified before an IJ at a merits hearing in November 2018.  He explained that he joined the BNP in 2005, when he was in high school, and would lead meetings, deliver speeches, and distribute leaflets for BNP youth organizations, and he continued this political activity at college.  But he began to receive threats after the Awami League came to power in 2008.  One day in 2009, while Ohab was walking home from college, three Awami League members knocked him down, kicked him, and threatened him with a knife.  They told him to stop his BNP activities.  One of Ohab's assailants recited Ohab's home address and threatened to harm his

family and his "four beautiful sisters," but the assailants left when they heard someone coming. Ohab also described receiving other threats, including at a marketplace between 2010 and 2012, based on his participation in BNP activities.

Then, on April 4, 2012, according to Ohab, he was attending a peaceful BNP demonstration when nine or ten Awami League members arrived carrying iron rods, hockey sticks, knives, and other weapons and began to hit the assembled BNP members. Ohab fell as everyone began running. Awami League members began to hit him indiscriminately, and his right hand was cut trying to fend off a knife attack. Ohab lost consciousness after that.

He awoke in a hospital and needed three stitches. After being treated by the doctor, he and other BNP victims went to the police station to report the attack, but the police refused to accept the report when Ohab named the Awami League. When Ohab insisted on filing a report, he and others were arrested and detained by police for approximately two to three hours, before being released with the help of BNP lawyers and leaders. Ohab was not harmed at the police station. Ohab testified that, after these events, for more than a year, he did not leave his home compound out of fear.

In 2013, Ohab's father spoke with a man who arranged for him to leave Bangladesh for the United States. Ohab first flew to Bolivia and then traveled north from there by bus, truck, boat, and foot, eventually reaching the United States in November 2013.

After he left, his mother told him that Awami League members had vandalized the family's home and would kill him if he returned.

In response to the IJ's questions, Ohab explained that he possessed a Bangladeshi passport when traveling from Bangladesh to Bolivia, but it was taken from him. His father paid someone to obtain the new passport "[s]ometime in 2013," since his old one had expired. Ohab said that he did not apply in person. The IJ asked if he had to go anywhere to "get [his] picture on the passport," and Ohab responded that he went to the "passport office to get [his] picture taken" but reiterated he did not leave his home compound after the April 2012 incident. When the IJ pressed for clarification, Ohab said that he was unable to remember the precise details about obtaining his passport because his mind was not functioning properly at the time due to fear and stress. Ohab later said that he "went to apply for [his] passport" but could not "recall the exact year," and that it may have been in 2012.

## B. The IJ's Adverse Decision

After receiving submissions from the parties after the hearing, the IJ issued a written decision denying Ohab's application for asylum, withholding of removal, and CAT relief. Notably, the IJ made an adverse credibility determination, consisting of three main findings.

First, the IJ found that Ohab's testimony was "internally inconsistent concerning his passport," with shifting details about when and how he obtained the passport and passport photo. Second, the IJ determined that Ohab's testimony at the hearing was

inconsistent with his statements during the credible-fear interview. The IJ noted that Ohab failed to mention his alleged April 2012 arrest during the credible-fear interview, which was "hard to square with [his] claim that the arrest spurred his decision to leave Bangladesh." The IJ also reasoned that Ohab's hearing testimony failed to mention a specific event he described in the credible-fear interview—being told to leave the BNP by Awami League members on March 26, 2012. Finally, the IJ observed that Ohab "testified inaccurately about the violence inflicted by BNP," by minimizing or denying knowledge about documented instances of violence committed by BNP members.

Next, the IJ determined that Ohab had not submitted sufficient evidence to corroborate his testimony. In the IJ's view, many of the letters and affidavits Ohab submitted "recounted a different narrative than that which [Ohab] presented," referring to nonexistent "torture" by the police or otherwise contradicting certain details in Ohab's account. The IJ said that two letters were consistent with Ohab's account but were not "sufficient corroboration" to satisfy Ohab's burden of proof. Accordingly, the IJ concluded that Ohab failed to establish past persecution, a well-founded fear of persecution, or a likelihood of torture.

Ohab appealed to the BIA, challenging only the IJ's adverse credibility finding. A single member of the BIA dismissed the appeal, reasoning that IJ's adverse credibility finding was not clearly erroneous based on (a) inconsistencies regarding when and how he obtained his passport and (b) inconsistencies between Ohab's

statements during the credible-fear interview and his testimony at the merits hearing. The BIA found that these inconsistencies, while not sufficient to support an adverse credibility finding "individually," were enough "when considered collectively under the totality of the circumstances." The BIA also found that the letters and affidavits Ohab submitted were "not sufficient to rehabilitate his incredible testimony." In the BIA's view, the record evidence supported a finding that there were several inconsistencies between Ohab's testimony and these statements. Ohab now petitions this Court for review.

## II. Discussion

We review only the decision of the BIA, except to the extent that the BIA expressly adopted or agreed with the IJ's opinion. *Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 947–48 (11th Cir. 2010). We review the IJ's opinion to the extent that the BIA has found that the IJ's reasons were supported by the record, and we review the BIA's decision for those matters on which it rendered its own opinion and reasoning. *See Seck v. U.S. Att'y Gen.*, 663 F.3d 1356, 1364 (11th Cir. 2011). Here, we review both the IJ's and BIA's decisions to the extent of their agreement. *See id.*

We review factual findings, including credibility determinations, under the substantial-evidence test. *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1254–55 (11th Cir. 2006); *see D-Muhumed v. U.S. Att'y Gen.*, 388 F.3d 814, 818 (11th Cir. 2004) ("The trier of fact must determine credibility, and [we] may not substitute [our] judgment for that of the BIA with respect to credibility findings."). Review for

substantial evidence is deferential and is based on a construction of the record evidence that is most favorable to the agency's decision. *Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1350–51 (11th Cir. 2009). We must affirm the agency's decision "if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* at 1351 (quotation marks omitted). Findings of fact may be reversed only if the record compels a different result. *Id.* In other words, the mere fact that the record may support a contrary conclusion is not enough to justify reversal of the agency's findings. *Id.*

A noncitizen applying for asylum must prove, with reliable and specific evidence, that he is a "refugee." 8 U.S.C. § 1158(b)(1)(B)(i); *Forgue v. U.S. Att'y Gen.*, 401 F.3d 1282, 1287 (11th Cir. 2005). A refugee is someone unable or unwilling to return to his country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The applicant must show that he (1) was persecuted in the past on account of a protected ground or (2) has a well-founded fear that he will be persecuted in the future on account of a protected ground. *Ruiz*, 440 F.3d at 1257. An applicant for withholding of removal must establish similar, but more stringent, requirements. *D-Muhumed*, 388 F.3d at 819. Finally, an applicant seeking protection under CAT must establish that it is more likely than not that he would be tortured by or with the acquiescence of the government if removed. *Id.* at 819–20.

The applicant's credible testimony, standing alone, may be sufficient to meet his burden. *Chen v. U.S. Att'y Gen.*, 463 F.3d 1228, 1231 (11th Cir. 2006). But if the applicant is found not credible and has not provided any corroborating evidence, an adverse credibility determination alone may be sufficient to support the denial of his claims for relief from removal. *Forgue*, 401 F.3d at 1287. Nevertheless, where the applicant offers evidence beyond his own testimony, the agency has a duty to consider that other evidence even if it finds that the applicant is not credible. *Id.*

## A. Adverse Credibility Finding

Ohab maintains that he provided detailed and consistent statements and testimony in connection with the material aspects of his claim, and that the BIA and IJ focused on "trivial inconsistencies and omissions" in making an adverse credibility finding. He contends that his testimony was sufficient not only to establish asylum, but also the more stringent requirements of withholding.

In challenging an adverse credibility finding, the noncitizen bears the burden of showing that it "was not supported by specific, cogent reasons or was not based on substantial evidence." *Forgue*, 401 F.3d at 1287 (quotation marks omitted). Factors relevant to a credibility determination include, but are not limited to, the demeanor, candor, and responsiveness of the applicant; the plausibility of the applicant's account; the consistency between the applicant's written and oral statements; the internal consistency of each statement; and the consistency of the applicant's statements with

other record evidence, including country reports.    8 U.S.C. § 1158(b)(1)(B)(iii).

In evaluating the consistency of an applicant's account, IJs must consider "the circumstances under which the statements were made."  8 U.S.C. § 1158(b)(1)(B)(iii).  "An IJ may of course consider whether there are contradictions between [an initial] interview and later testimony," but the IJ also must be mindful that initial statements may be "less detailed than the [noncitizen's] later testimony."  *Tang v. U.S. Att'y Gen.*, 578 F.3d 1270, 1279 (11th Cir. 2009) (discussing the circumstances of an initial "airport interview").  In that scenario, the IJ "should not focus exclusively on . . . omissions, rather than contradictions, when determining whether the [noncitizen] is credible."  *Id.*  Nonetheless, the IJ is free to consider omissions from an initial interview as support for an adverse credibility finding.  *See Shkambi v. U.S. Att'y Gen.*, 584 F.3d 1041, 1051 (11th Cir. 2009) (relying in part on the omission of "entire incidents and other significant facts both during his airport interview and again at his credible-fear interview" to sustain an adverse credibility finding).

Inconsistencies and inaccuracies need not "go[] to the heart of the applicant's claim" to support an adverse credibility finding, *id.*, but they also cannot be "wholly immaterial," *Kueviakoe v. U.S. Att'y Gen.*, 567 F.3d 1301, 1305 (11th Cir. 2009).  Because of the deferential standard of review, however, a reasonable explanation for inconsistencies in the applicant's testimony does not necessarily compel reversal of the IJ's adverse credibility determination.  *See*

*Chen*, 463 F.3d at 1233 ("[W]hile Chen's explanations of the implausible aspects of his claim are tenable, we cannot say, especially given the relative lack of corroborating evidence, that these explanations would compel a reasonable fact finder to reverse the IJ's credibility determination.").

The BIA offered two main reasons for agreeing with the IJ's adverse credibility determination: (1) "inconsistencies in [Ohab's] testimony regarding when he obtained his passport, how he obtained his passport and passport photo despite being in hiding, and how many passports he used when traveling to the United States"; and (2) "inconsistencies between [Ohab's] credible fear interview, which occurred about a month after his arrival in the United States, and testimony at the hearing."

Here, substantial evidence supports the IJ's determination that Ohab's vague or inconsistent testimony about his passport undermined his credibility. In fact, Ohab's briefing does not dispute any of the agency's findings on this point. As the IJ explained, Ohab initially stated that he left Bangladesh using a passport that his father had obtained for him in 2013, while he was in hiding after the April 2012 attack, but later insisted that he obtained the passport in 2012 before the second attack. Similarly, Ohab claimed that he did not apply in person and that his father took care of everything, but then said he applied in person at the passport office. Ohab also could not clearly or consistently explain the circumstances of his passport photo, stating variously that a new photo was not necessary for a renewal, that he had his photo taken at the bazaar before

the second attack, that he had his photo taken at the passport office, and then finally, after persistent inquiry by the ALJ, that he did not remember the details.

Although these details are largely ancillary to Ohab's claims, and despite the potential for simple miscommunication, the inconsistencies described above are not "wholly immaterial" to his credibility. *Cf. Kueviakoe*, 567 F.3d at 1305 (rejecting the BIA's reliance on a "wholly immaterial" inconsistency between the word "car" and "truck" in the petitioner's testimony). As the BIA noted, Ohab "has not adequately explained why he made multiple internally inconsistent statements regarding his passport."

Substantial evidence also supports the IJ's determination that differences between his credible fear interview and testimony at the hearing adversely affected Ohab's credibility. The IJ found in part that Ohab failed to mention his arrest by police in April 2012 during the credible fear interview, even though his arrest was an important detail in his testimony and evidence at the hearing. The IJ also found that Ohab's hearing testimony failed to include being threatened on March 26, 2012, a date he had mentioned in his credible fear interview.

We agree with Ohab that the differences between his statements are better characterized as omissions rather than contradictions. But we cannot say it was unreasonable for the ALJ to rely in part on them in making an adverse credibility finding. *See Shkambi*, 584 F.3d at 1051–52 (affirming an adverse credibility finding based in part on an applicant's omission of "significant facts" from his

initial interviews).  Ohab notes that the credible interview was short and that he was not asked if he was arrested.  But the IJ expressly acknowledged that a credible fear interview was distinct from a hearing, and that an applicant may provide "further elaboration during a hearing" for an "abbreviated statement" during a preliminary interview.

Still, the IJ found that the omission of Ohab's arrest was notable since Ohab had mentioned the police at the credible fear interview but simply stated that the police 'refused to take the report because the Awami League is in power.'"[1]  And the record does not compel a conclusion that Ohab was merely elaborating on, rather than attempting to bolster, his initial account.  For instance, some of the letters Ohab submitted claimed that Ohab had been tortured in police custody, which Ohab personally denied.  As for Ohab's omission of the March 26, 2012, date from the hearing, the IJ noted

---

[1] Here is the relevant portion of the transcript of the credible fear interview:

> [Asylum Officer (AO)] Did you report to the police about this incident?
>
> [Ohab] Yes, I went to the police station to report around 7 pm.
>
> [AO] What did you tell the police?
>
> [Ohab] I told them that the Awami League members came to the meeting and attacked me.
>
> [AO] What did the police tell you?
>
> [Ohab] They refused to take the report because the Awami League is in power right now.

that it did not implicate the "challenges unique to preliminary immigration interviews," since a specific occurrence mentioned in his brief credible fear interview was omitted from his more expansive hearing testimony. Beyond calling the omission trivial, Ohab offers no argument that the IJ could not rely on this omission as support for an adverse credibility finding.

For these reasons, substantial evidence supports the IJ's adverse credibility determination. The record supports the IJ's findings that Ohab provided inconsistent testimony about his passport and that there were notable differences between his statements during the credible fear interview and his testimony at the hearing. The inconsistencies and omissions don't strike us as especially significant, do not go to the heart of Ohab's claims, and may have reasonable explanations. But the standard of review requires us to deny a petition unless the record compels a contrary conclusion on credibility. *See Chen*, 463 F.3d at 1233. And here, we can't say it does.[2]

## B.  Pattern or Practice Discrimination

---

[2] Notably, Ohab does not challenge the IJ's or BIA's assessment of the affidavits and letters he submitted or their effect on his credibility, nor does he contend that the corroborating evidence was sufficient on its own to establish the truth of the matters in his testimony. We therefore consider any argument along these lines to have been abandoned. *See Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) ("When an appellant fails to offer argument on an issue, that issue is abandoned."). For the same reason, Ohab has also abandoned any challenge to the denial of CAT relief.

Next, Ohab contends that he established a well-founded fear of persecution because, in his view, a "pattern or practice" of persecution against persons similarly situated to him exists in Bangladesh. He claims that proof of such a pattern or practice appears in the country reports, and that the IJ failed to adequately consider this evidence, even if his own testimony is deemed not credible. We conclude that this issue is not properly before us.

We may review a final order of removal only if a petitioner has "exhausted all administrative remedies available . . . as of right." 8 U.S.C. § 1252(d)(1). This exhaustion requirement is a "claim-processing rule," not a limit on our jurisdiction, contrary to our prior precedent on this point. *Santos-Zocaria v. Garland*, 598 U.S. 411, 415 n.2, 417–19, 422 (2023); *see, e.g., Alim v. Gonzales*, 446 F.3d 1239, 1253 (11th Cir. 2006). But even so, as a claim-processing rule, we generally apply it when a party asserts it. *Kemokai v. U.S. Att'y Gen.*, 83 F.4th 886, 891 (11th Cir. 2023).

To exhaust a claim, a petitioner must raise the "core issue" before the BIA and "set out any discrete arguments he relies on in support of that claim." *Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 800 (11th Cir. 2016). While a petitioner is not required to use "precise legal terminology" or offer well-developed arguments, he must provide the BIA with sufficient information to enable it to "review and correct any errors below." *Indrawati v. U.S. Att'y Gen.*, 779 F.3d 1284, 1297 (11th Cir. 2015) (quotations omitted).

Here, Ohab failed to exhaust any argument that the IJ erred by refusing to evaluate issues beyond his credibility, or that the

record was sufficient to establish pattern-or-practice discrimination even apart from his credibility. His brief on appeal to the BIA raised one, and only one, issue: whether the IJ erred in making an adverse credibility finding. Although the government has not expressly invoked the exhaustion rule on appeal, it argues that Ohab's arguments on this point "are not properly before this Court" because the Board did not reach them, which we construe as a sufficient objection. *See Kemokai*, 83 F.4th at 891.

What's more, the merits of the pattern-or-practice claim is outside the scope of our review. "[W]e may review only the rulings made by the immigration judge or Board of Immigration Appeals that affect the validity of the final order of removal." *Clement v. U.S. Att'y Gen.*, 75 F.4th 1193, 1199 (11th Cir. 2023) (quotation marks omitted). That's because "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *Id.* (quotation marks omitted). The record shows that the IJ and the BIA treated the adverse credibility finding as effectively dispositive, and did not address whether, even without Ohab's credible testimony, he could establish a well-founded fear of persecution based on a pattern or practice theory. So any appeal would be limited to whether the BIA erred in failing to consider the issue, not the underlying merits. *See id.* But for the reasons we just explained, Ohab failed to exhaust any argument along these lines, so we decline to consider the issue for the first time on appeal.

**PETITION DENIED.**